# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

SHAVONNE HALTERMAN,                  )
                                     )
            Plaintiff,          )
                                     )
            v.                  )     No. 6:25-cv-03101-RK
                                     )
RYAN ERVIN, LEE GEIGER, BRETT        )
PARROTT,  and  COUNTY  OF            )
PULASKI COUNTY, MISSOURI;            )
                                     )
            Defendants.         )

## ORDER

Before the Court is Defendants' motion to dismiss.  (Doc. 7.)  This motion has been fully briefed.  (Docs. 9, 26, 33.)[1]  After careful consideration and for the reasons explained below, Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part**.

### Legal Standard

To survive a motion to dismiss for failure to state a claim under 12(b)(6), a complaint must provide "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While a complaint does not need to include detailed factual allegations, the complaint must allege "more than a sheer possibility that a defendant acted unlawfully" to survive a motion to dismiss.  *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 371 (8th Cir. 2017).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  The Court generally "accept[s] the allegations contained in the complaint as true and draw[s] all reasonable inferences in favor of the nonmoving party."  *Cole v. Homier Dist. Co.*, 599 F.3d 856, 861 (8th Cir.

---

[1] Defendants also filed a motion for extension of time to file an answer to the Amended Complaint, (Doc. 17), to which Plaintiff did not file a reply.  Upon finding of good cause and excusable neglect, Defendants' motion for extension of time to file an answer to the Amended Complaint is **GRANTED** as unopposed and for the reasons set forth in Defendants' suggestions in support, (Doc. 18).  Therefore, the Court considers Defendants' motion to dismiss timely filed and proceeds to consider the motion on its merits.

2010) (quoting *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)). However, the principle that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal*, 556 U.S. 662, 678 (2009).

A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). "Videos of an incident are necessarily embraced by the pleadings," *Ching v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023), and may be considered in deciding a motion to dismiss, *Waters v. Madson*, 921 F.3d 725, 731 n.2 (8th Cir. 2019).[2] The Court need not "adopt the plaintiff's version of the facts if they are 'blatantly contradict[ed]' by video evidence. *Waters*, 921 F.3d at 734 (quoting *Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017)).

## Background[3]

On April 29, 2023, at about 7:43 pm, Plaintiff Shavonne Halterman called the Pulaski County Sheriff's Department for protection from multiple "intruders" at her residence.[4] In response to Plaintiff's call, Deputies Ervin and Geiger and Lieutenant Parrott (collectively, "Officer Defendants") arrived at Plaintiff's residence in multiple vehicles. Body cameras worn by Officer Defendants recorded the ensuing interaction, which lasted more than an hour and a half.

Outside Plaintiff's residence, Officer Defendants conversed with one of the "intruders," Bobby Lee Halterman, who provided identification to the officers and a deed purportedly indicating his ownership of the house. (Ex. A at 19:57:15-20, 19:59:20-40 (Deputy Ervin body camera).) Mr. Halterman was attempting to remove his truck from the driveway and pick up work items and clothes from inside the house. (Ex. A at 20:01:15-27.) Mr. Halterman repeatedly

---

[2] The Court notes that Plaintiff does not dispute the authenticity of the body camera video exhibits. Her only complaints are that the body camera footage of Defendant Pulaski County Sheriff's Department Deputy Lee Geiger was provided without sound and the body camera footage of Defendant Pulaski County Sheriff's Department Lieutenant Brett Parrott is missing. Plaintiff does not contest the authenticity or completeness of the body camera footage of Defendant Pulaski County Sheriff's Department Deputy Ryan Ervin; in fact, Plaintiff relies on Deputy Ervin's body camera footage in opposing the motion to dismiss. Lieutenant Parrott later produced his body camera footage while this lawsuit was pending.

[3] The Court draws the factual background from Plaintiff's Amended Complaint, (Doc. 4), and from the body camera video evidence of Lieutenant Parrott and Deputies Ervin and Geiger.

[4] The "intruders" referenced in Plaintiff's Amended Complaint are Bobby Lee Halterman and three younger family members, two women and a man. As of April 29, 2023, Mr. Halterman and Plaintiff were married, but it appears that divorce proceedings had been initiated.

2

informed Deputy Ervin that Plaintiff was physical and violent. (Ex. A at 19:57:05-12, 20:05:21-40, 20:07:15-20, 20:51:10-15.)

Within thirty minutes of arriving at Plaintiff's residence, the Officer Defendants gave Mr. Halterman permission to enter the residence to retrieve his clothes.[5] Plaintiff refused to comply and permit Mr. Halterman to enter, despite hearing Deputy Ervin give him permission to do so three times. (Ex. A at 20:12:45-15:20.) Mr. Halterman did not enter the house at this time, and Plaintiff went back inside the residence.

Deputies Ervin and Geiger asked whether there were weapons in the house and were informed that there were potentially two shotguns and a crossbow in the house. (Ex. A at 20:31:20-34.) Shortly thereafter, someone at the scene requested that the Officer Defendants perform a wellbeing check on a minor child in the residence with Plaintiff. (Ex. A at 20:32:15-25.) Lieutenant Parrott and Deputy Ervin knocked on the front door several times, announced that it was the Sheriff's Office, and requested that Plaintiff come to the door; Plaintiff failed to comply with opening the front door for over three minutes. (Ex. A at 20:40:12-43:12.) Plaintiff eventually opened the front door, and Lieutenant Parrott gained entry to the house and checked on the minor child. (Ex. A at 20:40:15-50.)

Lieutenant Parrott then told Plaintiff to find the keys to Mr. Halterman's truck so he could get his work clothes out of the truck. (Ex. A at 20:40:47-52.) Plaintiff provided access to the truck and then proceeded to deny Mr. Halterman entry to the house because all of his clothes were purportedly in the truck. (Ex. A at 20:50:25-32.) Plaintiff appeared to attempt to leave the residence after this, and was sitting in her Jeep, but Plaintiff alleges that she was "not allowed to leave her property because the intruders and [Officer] Defendants blocked the driveway and road." (Doc. 4 at ¶ 18.)

Officer Defendants continued to inform Plaintiff that Mr. Halterman could enter the residence. (Ex. A at 20:57:33-48 (Lieutenant Parrott telling Plaintiff, "I've already told him he could go in.").) After the exterior garage door to the residence was opened,[6] (20:59:33), Mr.

---

[5] Plaintiff alleges that Officer Defendants gave permission to all of the "intruders" to enter the residence. This allegation is blatantly contradicted by the video evidence which shows Officer Defendants giving Mr. Halterman permission to enter the house but stating that he would need to be the one to enter—not the other people with him.

[6] It is unclear from the pleadings and body camera footage who opened the exterior garage door. The Court notes that the exterior garage door appeared to open automatically, rather than by a person manually pulling up the garage door.

3

Halterman picked up a crowbar and approached the interior garage door to gain entry to the residence. Plaintiff approached him and then stood in front of the interior garage door blocking his entry to the residence. (Ex. A at 21:02:40-03:35.) Mr. Halterman moved away from the interior garage door. A few seconds later, Plaintiff then walked away from the interior garage door. (*Id.*) Lieutenant Parrott again informed Plaintiff that Mr. Halterman could enter the house. (Ex. A at 21:03:57-04:012 ("He can go in his house" and "[h]e has access to his house.").)

Mr. Halterman then returned to the interior garage door, picked up the crowbar, and again attempted to gain entry to the residence. Plaintiff quickly approached the interior garage door where Mr. Halterman was standing with her hands in front of her. She made contact with Mr. Halterman who said "[d]on't touch me, she just . . . ." (Ex. A at 21:04:25-28.) At that point, Deputy Ervin handcuffed Plaintiff and placed her under arrest. Plaintiff alleges that Deputy Ervin "aggressively" handcuffed her and positioned the handcuffs to form a "teardrop" shape which "caused bruising and significant pain." (Doc. 4 at ¶ 19.) Plaintiff alleges that "[t]he handcuffs were extremely tight against her wrists."[7] (*Id.*)

While being handcuffed, Plaintiff attempted to pull her arm away to answer her cell phone and had to be instructed to stop moving. (Ex. A 21:04:45-05:10.) After being handcuffed, Plaintiff was escorted by Deputies Ervin and Geiger out of the garage, up the driveway, and to the patrol cars. As Plaintiff passed her Jeep, Deputy Geiger's body camera video shows Plaintiff attempted to grab her purse off the hood of the Jeep. (Ex. B at 21:06:05-10.) Deputy Ervin directed Plaintiff to "stop walking away from me," and Plaintiff yelled for her neighbor to come help her. (Ex. A at 21:05:19-25.) Plaintiff alleges that Deputy Ervin "slammed the Plaintiff's stomach into the handle of her jeep with enough force to drop the magazine for his gun," which she found the next day.

---

[7] Defendants argue that this claim is contradicted by the video evidence. However, based on the Court's review of the body camera video and still shots of the body camera video attached to Plaintiff's suggestions in opposition, (Doc. 27-1 at 2-4), the Court disagrees because the video is unclear as to this claim. The video does not blatantly contradict Plaintiff's allegation that the handcuffs were excessively tight. The parties' own conflicting interpretations of the body camera video also lend support to the Court's inconclusive findings regarding the video evidence.

While the Court's citations largely refer to Deputy Ervin's body camera footage, the Court also reviewed the additional body camera footage of Deputy Geiger and Lieutenant Parrott in coming to the conclusions herein.

4

(Doc. 4 at ¶ 20.)[8]  Plaintiff and Deputies Ervin and Geiger then continued to walk up the driveway toward the patrol cars.

As they approached the patrol cars, Deputy Geiger instructed Plaintiff to let go of the keys she was holding in one of her hands.  (Ex. A at 21:05:48-51.)  Plaintiff alleges that Deputies Ervin and Geiger then "placed their feet above the Plaintiff's feet and on the Plaintiff's shins to trip the Plaintiff," and "used their knees to push into the Plaintiff's calves."  (Doc. 4 at ¶ 21.)[9]  Plaintiff fell to the ground and lost consciousness due to her head hitting the gravel road.  Officer Defendants called EMS to the scene.  When Plaintiff regained consciousness, Officer Defendants assisted her to a standing position and put her in a patrol car.

Officer Defendants then went through Plaintiff's purse and confiscated her medical marijuana and microdosing dispensing device.  While in the patrol car, Plaintiff complained that her hands really hurt.  Deputy Geiger checked on Plaintiff and informed her that if he can fit a finger between the handcuffs and her wrists that the handcuffs are loose and directed her "don't lean on your hands."  (Ex. A 21:09:55-10:12.)  Deputy Ervin told Lieutenant Parrott that he arrested Plaintiff for peace disturbance.  Deputy Ervin later stated to EMS that Plaintiff would be arrested upon release from care for assault, which is consistent with Deputy Ervin's report (providing assault as the reason for arrest).

While Plaintiff was in the emergency room, Officer Defendants allowed Mr. Halterman and the "intruders to have unsupervised access to the Plaintiff's residence.  The intruders removed Plaintiff's property and threw food and other items on the carpet."  (Doc. 4 at ¶ 30.)

---

[8] Defendants also argue that this claim is contradicted by the video evidence.  However, based on the Court's review of the video evidence, the Court similarly disagrees because the video is unclear as to this claim.  The videos do not blatantly contradict Plaintiff's allegation that she was slammed into the handle of the Jeep with force that caused Deputy Ervin's gun magazine to fall to the ground.  Rather, the videos depict Deputy Ervin leading Plaintiff past the Jeep and putting Plaintiff against the Jeep's door (the amount of force with which he did so is unclear, as is whether his gun magazine fell to the ground).

[9] Defendants argue that the video depicts Plaintiff pulling away from the deputies and resisting before going to the ground.  Again, the Court finds that the body camera video does not blatantly contradict Plaintiff's allegations as to how she ended up on the ground.  Plaintiff's and Deputies Ervin's and Geiger's feet and legs are not clearly visible in the body camera footage at the time Plaintiff falls to the ground.  Moreover, Plaintiff alleges that an eyewitness saw the deputies trip her in the manner described.  Thus, for purposes of resolving the motion to dismiss, the Court accepts Plaintiff's allegation regarding this use of force.  Further, Plaintiff contends that she was not resisting and that Pulaski County Sheriff's Department trains deputies to use "force methods," including tripping and pushing handcuffed suspects, which "create[e] the illusion of someone trying to flee in body camera footage."  (Doc. 26 at 12.)

Plaintiff filed this lawsuit asserting twelve counts arising from the hour-and-a-half interaction and Plaintiff's arrest on April 29, 2023. Plaintiff's Amended Complaint asserts the following claims:

- Count 1: Violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments against Officer Defendants;

- Count 2: Violations of statutory civil rights against Officer Defendants;

- Count 3: A *Monell* Claim against Pulaski County for a policy and practice to cover up excessive force, and for failure to train and supervise;

- Count 4: Conspiracy under 42 U.S.C. § 1981, 1983, and 1985 against all Defendants;

- Count 5: Respondeat superior against Pulaski County for intentional torts of Officer Defendants;

- Count 6: Respondeat superior against Pulaski County for intentional torts and use of force by Officer Defendants;

- Count 7: Negligence for excessive force against Officer Defendants;

- Count 8: Punitive damages against "Defendant";

- Count 9: Respondeat superior against Pulaski Count for negligence of Officer Defendants;

- Count 10: Negligent training, supervision, and control of officers against Pulaski County;

- Count 11: Punitive damages against Pulaski County; and

- Count 12: Malicious abuse of process, false arrest, and false imprisonment against Officer Defendants.

(*See generally* Doc. 4.) Defendants now move to dismiss Plaintiff's Amended Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure and on the grounds that the Officer Defendants are entitled to qualified immunity. (Docs. 8, 9.)

Further facts are set forth below as necessary.

## Discussion

### I. Claims Against the "Sheriff's Department"

Plaintiff's Amended Complaint lists as named defendants Pulaski County Sheriff's Department Deputy Ryan Ervin, Pulaski County Sheriff's Department Deputy Lee Geiger, Pulaski County Sheriff's Department Lieutenant Brett Parrott, and the County of Pulaski, Missouri. (Doc. 4 at 1.) However, Plaintiff frequently asserts claims against or seeks damages from the "Sheriff's Department." (Doc. 4 at 6-8 (Count 3, Count 4, Count 5, Count 6, Count 9, Count 10, Count 11).)

6

Defendants argue that the "Sheriff's Department" is an improper defendant. *See Ketchum v. City of West Memphis*, 974 F.2d 81, 82 (8th Cir. 1992). Plaintiff concedes that she intended to name the County of Pulaski, rather than the Sheriff's Department, throughout the Amended Complaint. (Doc. 26 at 2.) Therefore, the Court construes Plaintiff's complaint only as asserting claims against Pulaski County rather than the Pulaski County Sheriff's Department.

## II.    Claims Against Officer Defendants in Their Official Capacities

Plaintiff's Amended Complaint asserts claims against Officer Defendants in their individual and official capacities. (*See generally* Doc. 4.) Defendants argue that Plaintiff's claims against Officer Defendants are redundant to her claims against Pulaski County and should be dismissed. The Court agrees. *See Downs v. Bush*, No. 24-1456, 2025 WL 2058352, at *1 (8th Cir. July 23, 2025) ("We agree with the district court that the official capacity claim against Sheriff Bush is duplicative of the claim against Ray County."); *id.* ("A suit against a public employee in his or her official capacity is merely a suit against the public employer." (quoting *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)). Therefore, each claim against Officer Defendants in their official capacities is **DISMISSED**.

## III.   Plaintiff's Amended Complaint Causes of Action

### A.    Count 1 – 42 U.S.C. § 1983 Against Officer Defendants

In Count 1 of the Amended Complaint, Plaintiff asserts claims against Officer Defendants "for violation of Plaintiff's First, Fourth, Fifth, Eighth and Fourteenth Amendment rights in their individual capacities." (Doc. 4 at 6.) The Court construes Plaintiff's allegations of constitutional violations against Officer Defendants as claims brought pursuant to 42 U.S.C. § 1983.[10] "Every section 1983 action has two key elements: (1) the violation of a right secured by the Constitution and laws of the United States (2) by a person acting under color of state law." *Yassin v. Weyker*, 39 F.4th 1086, 1089 (8th Cir. 2022) (internal quotation marks omitted).

As to each claim in Count 1, Officer Defendants argue that Plaintiff has failed to state a claim and, alternatively, they are entitled to qualified immunity. "Qualified immunity generally protects public officials from § 1983 lawsuits where the officials' conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

---

[10] Plaintiff does not refer to 42 U.S.C. § 1983 in Count 1 itself, but elsewhere in the Amended Complaint states that this action is brought "pursuant to 42 U.S.C. § 1983." (Doc. 4 at 1.) Defendants have also construed Count 1 as asserting claims pursuant to § 1983 in the motion to dismiss.

*L.G. v. Columbia Pub. Sch.*, 990 F.3d 1145, 1147 (8th Cir. 2021) (internal quotation marks omitted). The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

### 1. Fifth and Eighth Amendments

Officer Defendants first argue that Plaintiff has failed to allege any basis for a claim under the Fifth Amendment or Eighth Amendment. (Doc. 9 at 8.) Plaintiff concedes that she "erroneously listed the Fifth and Eighth Amendments." (Doc. 26 at 2.) Therefore Count 1 is **DISMISSED** as to any Fifth Amendment and Eighth Amendment claims.

### 2. First Amendment

Next, Officer Defendants argue that Plaintiff has failed to allege any element of her claim under the First Amendment and that they are entitled to qualified immunity as to this claim. The basis or theory of Plaintiff's First Amendment claim is not clear in the Amended Complaint. The Court construes Plaintiff's claim as a First Amendment retaliation claim, pursuant to which Plaintiff must show:

> [1] that the plaintiff engaged in protected activity, [2] that the officer(s) "took adverse action . . . that would chill a person of ordinary firmness from continuing in the [protected] activity," [3] that the adverse action was motivated by the plaintiff's protected activity, and [4] that the officer(s) lacked probable cause or arguable probable cause.

*Just v. City of St. Louis*, 7 F.4th 761, 768 (8th Cir. 2021) (quoting *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 984-85 (8th Cir. 2019)). "Probable cause exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Brown v. City of St. Louis*, 40 F.4th 895, 900 (8th Cir. 2022) (internal quotation marks omitted). "To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.* (internal quotation marks omitted). "The existence of probable cause depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* (internal quotation marks omitted). "Whether probable cause existed is a legal question." *Just*, 7 F.3th at 767 (quoting *Odom v. Kaizer*, 864 F.3d 920, 923 (8th Cir. 2017)).

Plaintiff has failed to plausibly plead facts supporting a First Amendment retaliation claim in the Amended Complaint. Plaintiff does not plead that she engaged in any protected activity

8

apart from her 911 call to the Pulaski County Sheriff's Office. The Amended Complaint is also "silent about causation. It includes no allegations tethering a retaliatory motive to an adverse action." *Hoel v. Prouse*, No. 25-cv-2342 (EC/LIB), 2025 WL 3033945, at *4 (D. Minn. Oct. 30, 2025) (dismissing First Amendment retaliation claim for failure to state a claim).

Although Plaintiff's claim is unclear on the face of the Amended Complaint, Plaintiff's theory as to her First Amendment retaliation claim is made somewhat clearer in her suggestions in opposition to the motion to dismiss. Plaintiff claims that she was arrested for defending herself and her property through her freedom of speech. (Doc. 26 at 2.) Because Plaintiff is proceeding pro se and Defendants responded substantively to the additional allegations in Plaintiff's suggestions in opposition, the Court will consider her additional arguments here (though her allegations do not appear on the face of the Amended Complaint). *See Ketchum v. City of West Memphis*, 974 F.2d 81, 82 (8th Cir. 1992) (considering additional facts contained in pro se opposition to motion to dismiss, treating additional facts as de facto amendments to the complaint).

Even considering Plaintiff's additional argument and allegations in her opposition to the motion to dismiss, however, the Court finds that Plaintiff's First Amendment retaliation claim warrants dismissal because the Officer Defendants are entitled to qualified immunity. Determining whether an officer is entitled to qualified immunity is a "two-step inquiry, asking if: '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" *Just*, 7 F.4th at 766 (quoting *Bell v. Neukirch*, 979 F.3d 594, 602 (8th Cir. 2020)). Here, Plaintiff has failed to demonstrate the deprivation of a constitutional or statutory right because the officers had probable cause, or at the least arguable probable cause, to arrest her. *See id.* at 768 ("[A] First Amendment retaliatory arrest claim is defeated by a showing of probable cause (or arguable probable cause).").[11]

Several facts apparent from the body camera video evidence show that there was probable cause, or at least arguable probable cause, to arrest Plaintiff for assault or domestic assault: (1) Officer Defendants were told that Plaintiff and Mr. Halterman were married, with potential divorce proceedings and other court proceedings ongoing between them; (2) Officer Defendants

_____

[11] The former, "actual probable cause" goes to "the constitutional violation prong" of the qualified immunity analysis, while the latter, "arguable probable cause," goes to the "clearly established prong" of the qualified immunity analysis. *Brown*, 40 F.4th at 901.

repeatedly told Mr. Halterman that he had a right to enter the residence, which Plaintiff heard yet continued to deny him access; (3) Plaintiff quickly approached the interior garage door while Mr. Halterman was attempting to enter after being told he could enter the home by Officer Defendants; (4) Plaintiff was holding keys in her hand at this time; (5) Plaintiff reached her arm out and made contact with Mr. Halterman; and (6) on the video, Mr. Halterman can be heard saying "[d]on't touch me, she just . . . ." (Ex. A at 21:04-25-28.) Thus, the video establishes probable cause that Plaintiff knowingly caused physical contact with Mr. Halterman knowing he would find that contact offensive. *See* Mo. Rev. Stat. §§ 565.076.1(5) (domestic assault in the fourth degree), 565.056.1(6) (assault in the fourth degree).[12]

Plaintiff argues that Deputy Ervin's reason for her arrest shifted from "peace disturbance," which he told Lieutenant Parrott right after the arrest, to "assault," which he told the EMT when transferring Plaintiff into their care, and that his shifting explanations show lack of probable cause. However, "[r]egardless of the ultimate offense charged, probable cause to arrest an individual exists if the facts known to the officer establish probable cause to arrest for *any* violation of the law." *Hosea v. City of St. Paul*, 867 F.3d 949, 956 n.6 (8th Cir. 2017); *see also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[An officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); *Wood v. Wooten*, 986 F.3d 1079, 1081 (8th Cir. 2021) ("[T]he validity of the arrest should be judged by whether the arresting officers actually had probable cause for the arrest, rather than by whether the officers gave the arrested person the right reason for the arrest."). Therefore, even though Deputy Ervin's stated reason for Plaintiff's arrest shifted, the proper consideration is whether the facts Deputy Ervin knew provided probable cause for any offense. As previously discussed, the Court concludes that the facts apparent from the body camera video provided probable cause to arrest Plaintiff for assault and domestic assault.

Ultimately, having found that Officer Defendants had probable cause, or in the alternative at least arguable probable cause, to arrest Plaintiff, Officer Defendants are entitled to qualified

---

[12] For the same reasons cited in concluding Officer Defendants had probable cause to arrest Plaintiff for assault, the Court would alternatively find that there was at least arguable probable cause to arrest Plaintiff for assault, meaning that there was at least arguable probable cause for the arrest even if Plaintiff did not have physical contact with Mr. Halterman. In other words, it would be "objectively reasonable for the officers to mistakenly believe, under the totality of the circumstances," *Brown*, 40 F.4th at 900, that Plaintiff was committing or going to commit assault when she quickly moved toward Mr. Halterman and made contact with him.

immunity as to Plaintiff's First Amendment retaliatory arrest claim. *See Just*, 7 F.4th at 768 (finding officers entitled to qualified immunity on First Amendment retaliation claim where court "concluded that the Officers had probable cause, or at least arguable probable cause, to arrest Just"); *see also Brown*, 40 F.4th at 903 (finding officers entitled to qualified immunity on First Amendment retaliation claim where arguable probable cause existed for arrest). Therefore, Plaintiff's First Amendment claim is **DISMISSED** on the grounds of qualified immunity.

### 3. Fourteenth Amendment

The basis or theory of Plaintiff's Fourteenth Amendment claim is not clear in the Amended Complaint. In Plaintiff's suggestions in opposition to the motion to dismiss, however, Plaintiff clarifies that she intended to assert "claims under the equal protection and due process clauses of the Fourteenth Amendment" because "[e]qual protection and treatment of Plaintiff and preservation of evidence did not occur on April 29, 2023," and because "Defendants denied Plaintiff of property without proper procedure . . . ." (Doc. 26 at 2.)

As best as the Court can discern, only the following allegations in the Amended Complaint are relevant to any Fourteenth Amendment claim:

- Officer Defendants "allowed the intruders to persuade them to enter the Plaintiff's Residence." (Doc. 4 at ¶ 14.)
- "Within thirty minutes of the call, [Deputy] Ervin authorized the intruders to enter the Plaintiff's residence by any means necessary." (*Id.* at ¶ 15.)
- "The exterior garage door was damaged by the intruders." (*Id.* at ¶ 17.)
- "While Plaintiff was at the emergency room, the [Officer] Defendants allowed the intruders to have unsupervised access to the Plaintiff's residence. The intruders removed Plaintiff's property and threw food and other items on the carpet." (*Id.* at ¶ 30.)

Other than clarifying the theory for relief under the Fourteenth Amendment, Plaintiff does not add any additional relevant factual allegations in her suggestions in opposition to the motion to dismiss.

To state an equal protection claim under the Fourteenth Amendment, "Plaintiff[] must demonstrate that [she is] a member of a protected class[13] and must demonstrate Defendants

_____

[13] Plaintiff's Amended Complaint alleges that she is disabled; it is also clear from the face of the complaint that Plaintiff is a woman. In her suggestions in opposition to the motion to dismiss, Plaintiff only

'systematically and intentionally treated [her] differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Sanchez v. City of Branson*, No. 6:25-cv-03179-MDH, 2025 WL 2918421, at *3 (W.D. Mo. Oct. 14, 2025) (quoting *Nolan v. Thompson*, 521 F.3d 983, 989 (8th Cir. 2008)). Plaintiff fails to identify when or how Defendants treated Plaintiff differently than a similarly situated person. *See id.* at *4 (granting motion to dismiss equal protection claim where plaintiffs merely pleaded "Defendants have treated Plaintiffs differently than similarly situated property owners without rational basis"). Neither the Amended Complaint nor the suggestions in opposition to Defendants' motion to dismiss identify any similarly situated person who was treated more favorably than Plaintiff under the same or similar circumstances.[14]

Nor does Plaintiff plausibly state a claim for violation of the due process clause. Ostensibly, Plaintiff argues that she was deprived of a property interest because Officer Defendants permitted Mr. Halterman and "intruders" to enter the residence, at which point the "intruders" removed certain property. "A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Id.* at *3 (quoting *Reed v. Goertz*, 598 U.S. 230, 236 (2023)). First, the Court notes that Plaintiff alleges only that private individuals caused damage to and took property from her residence. An essential element to any § 1983 claim, including procedural due process, is that the action be taken "under color of state law." *Yassin*, 39 F.4th at 1089.

Second, even assuming the actions were taken "under color of state law" because Officer Defendants gave Mr. Halterman permission to enter the residence, "no deprivation of due process results from the negligent act or omission by an official causing unintended injury to life, liberty or property." *New v. City of Minneapolis*, 792 F.2d 724, 725 (8th Cir. 1986). Plaintiff does not allege any facts plausibly showing that *Officer Defendants* "intentionally and recklessly confiscated or destroyed property." *Aimes v. Whelchel*, No. 5:16-CV-05293, 2017 WL 1370743, at *2 (W.D. Ark. Apr. 7, 2017). Plaintiff does not allege that Mr. Halterman lacked the right to enter the home. At most, even assuming Officer Defendants negligently gave Mr. Halterman

---

appears to rely on her status as a woman to support her equal protection claim. Discussion of her disabilities appears in arguments in support of her Fourth Amendment claims. (*See* Doc. 26 at 11-12.)

[14] For example, Mr. Halterman did not attempt to prevent Plaintiff from entering the residence (unlike Plaintiff's repeated attempts to bar Mr. Halterman from entering the home despite the Officer Defendants' directions). Therefore, Mr. Halterman would not be a similarly situated person.

permission to enter the home, thus allowing for an alleged theft of her property, "that act or omission does not constitute a due process violation." *Decarvalho v. Telford*, No. 17-11224-MBB, 2017 WL 3668411, at *4 (D. Mass. Aug. 24, 2017) (finding no due process violation based on allegations that defendant-officers left the door to plaintiff's apartment unlocked and open after executing a "no knock" warrant to arrest plaintiff and where plaintiff's personal property was subsequently stolen).

Accordingly, Plaintiff's Fourteenth Amendment claim is **DISMISSED** for failure to state a claim.

### 4.      Fourth Amendment

The final constitutional violations alleged in Count 1 of the Amended Complaint are alleged violations of the Fourth Amendment. Plaintiff alleges that Officer Defendants made "an unreasonable search and seizure of her person," in connection with her arrest on April 29, 2023, and that the Officer Defendants used excessive force against her.

#### a.      Unreasonable Search and Seizure of Person

Plaintiff alleges that her warrantless arrest on April 29, 2023, was an unreasonable search and seizure in violation of the Fourth Amendment. As previously discussed, Plaintiff's arrest was supported by at least arguable probable cause (if not actual probable cause). Therefore, Officer Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claim of unreasonable search and seizure of person. "[A]n officer will be 'entitled to qualified immunity if there is at least arguable probable cause.'" *See Luong v. House*, 669 F. Supp. 3d 735, 748-49 (S.D. Iowa Apr. 11, 2023 (quoting *White v. Jackson*, 865 F.3d 1064, 1074 (8th Cir. 2017)) (concluding defendants had probable cause to arrest plaintiff and were therefore entitled to qualified immunity on a Fourth Amendment unreasonable seizure claim).[15]

#### b.      Excessive Force

Plaintiff also relies on the Fourth Amendment in alleging that Officer Defendants used excessive force against her. Specifically, Plaintiff alleges three uses of force were excessive:

---

[15] Plaintiff also alleges that "Defendants went through Plaintiff's purse and confiscated her medical marijuana and microdosing dispensing devise" after her arrest. "[A]nother exemption from the fourth amendment warrant requirement is that recognized for inventory searches of containers or articles in the possession of an arrested person." *United States v. Caves*, 890 F.2d 87, 93 (8th Cir. 1989) (finding search of arrested person's purse was not a violation of the Fourth Amendment). Because the Court has concluded that the arrest was supported by probable cause, the resulting search of Plaintiff's purse fails to support a claim under the Fourth Amendment.

1) "[Deputy] Ervin grabbed the Plaintiff without warning. He aggressively handcuffed the Plaintiff. The handcuffs were positioned to form a teardrop. This caused bruising and significant pain to the Plaintiff. The handcuffs were extremely tight against her wrists." (Doc. 4 at ¶ 19.)

2) "As the Plaintiff was in handcuffs and being walked to the patrol car, [Deputy] Ervin slammed the Plaintiff's stomach into the handle of her jeep with enough force to drop the magazine for his gun." (Doc. 4 at ¶ 20); and

3) "[Deputy] Ervin and [Deputy] Geiger placed their feet above the Plaintiff's feet and on the Plaintiff's shins to trip the Plaintiff. Then, they used their knees to push into the Plaintiff's calves. This was observed by an eyewitness." (Doc. 4 at ¶ 21.)

As a result of this final use of force, "Plaintiff fell straight to the ground without any means to brace herself for the impact when Defendants released her arms" and "Plaintiff lost consciousness due to her head smacking into the gravel road." (Doc. 4 at ¶¶ 22, 23.) Officer Defendants argue that the body camera video contradicts Plaintiff's allegations except that she "went to the ground." (Doc. 9 at 9.) As to Plaintiff's claim based on being taken to the ground, Officer Defendants argue that they are entitled to qualified immunity. Officer Defendants also argue that Plaintiff did not allege any use of force by Lieutenant Parrott and that he should thus be dismissed from this claim for failure to state a claim.

The Court begins with Officer Defendants' final point. Plaintiff alleges that Lieutenant Parrott, a higher-ranked officer than Deputy Ervin and Deputy Geiger, "participated in and failed to take reasonable steps to end the unlawful conduct alleged in this complaint." (Doc. 4 at ¶¶ 7-9.) "Officers who do not directly use excessive force, but fail to intervene to prevent the use of excessive force by another officer, may be liable for violating the Fourth Amendment." *Ortega v. City of St. Louis*, No. 4:18-cv-1576-DDN, 2021 WL 3286703, at *14 (E.D. Mo. Aug. 2, 2021) (citing *Nance v. Simmons*, 586 F.3d 604, 611-12 (8th Cir. 2009)). While Plaintiff's allegations pertaining to Lieutenant Parrott's failure to intervene are somewhat sparse, "at this stage of litigation, plaintiff only needs to allege facts sufficient to state a plausible claim for liability." *Id.* (citing *Baude v. City of St. Louis*, 476 F. Supp. 900, 914 (E.D. Mo. 2020)); *see Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011) ("The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see."). Broadly reading Plaintiff's pro se Amended Complaint, it is clear Plaintiff intended to assert a failure-to-intervene theory as to Lieutenant Parrott. The Court finds that the Amended Complaint states sufficient facts for such a claim.

14

However, the inquiry does not end there. Deputy Ervin and Deputy Geiger assert that they are entitled to qualified immunity as to Plaintiff's Fourth Amendment excessive force claims. If so, not only are they individually immune from suit but Lieutenant Parrott would be immune from suit under qualified immunity as well. *See Loggins v. Albert*, No. 24-1545, 2024 WL 5074756, at *1 (8th Cir. Dec. 11, 2024) (per curiam) (holding that supervisory officers were similarly entitled to qualified immunity on the "claims related to their failure to intervene" in the alleged excessive force where officers were entitled to qualified immunity on excessive force claim); *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015) (holding that qualified immunity applied to officer against whom a failure-to-intervene claim was alleged where officer against whom the accompanying excessive-force claim was alleged was entitled to qualified immunity).

As previously discussed, qualified immunity is a "two-step inquiry, asking if: '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" *Just*, 7 F.4th at 766 (quoting *Bell*, 979 F.3d at 602). A failure of proof at either step is dispositive. *See Howard v. Kan. City Police Dep't*, 570 F.3d 984, 987-88 (8th Cir. 2009); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (recognizing the court's discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first").

The Court addresses each of Plaintiff's alleged uses of excessive force in turn.

### 1. Tight Handcuffing

For the purposes of determining qualified immunity at the motion to dismiss stage, the Court considers the facts pleaded by Plaintiff unless blatantly contradicted by video evidence. Thus, as previously discussed, the Court takes as true Plaintiff's allegation that the handcuffs were in a teardrop position, caused bruising and pain to Plaintiff, and that the handcuffs were extremely tight against Plaintiff's wrists. The Court considers Defendants' argument that they are entitled to qualified immunity based on the foregoing facts.

"[T]he plaintiff has the burden of demonstrating that the law confirming [her] constitutional right was clearly established" at the time of the incident. *Carter v. Ludwick*, 139 F.4th 982, 990 (8th Cir. 2025); *see also Lewis v. City of St. Lewis*, 932 F.3d 646, 649 (8th Cir. 2019) (placing burden on plaintiff to show the law is clearly established at the motion to dismiss stage). Plaintiff cites very little case law in her suggestions in opposition to the motion to dismiss, and none of the case law Plaintiff cites establishes that she had a clearly established right to be free

15

from excessively tight handcuffs under the circumstances of this case.[16]  Plaintiff merely argues the broad proposition that her "[r]ights were 'clearly established' because 'any reasonable officer would understand] that Defendants' action violated those rights."  (Doc. 26 at 3 (quoting *Buschmann*, 76 F.4th at 1084).)  However, Plaintiff cannot rely on a general principle of law to overcome a claim of qualified immunity.

The Court's independent review of case law further demonstrates that Plaintiff's right to be free from excessively tight handcuffs under the circumstances of this case was not clearly established as of April 29, 2023.  Plaintiff merely alleges that the handcuffs caused bruising and pain; Plaintiff does not allege that there was any lasting or permanent injury due to the tight handcuffs.  "The Eighth Circuit previously found that an officer who applies handcuffs so tightly they break a suspect's wrist uses excessive force in violation of the Fourth Amendment." *Ortega*, 2021 WL 3286703, at *14 (citing *Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir. 2002)).  However, "[i]t has not been clearly established that anything less than this constitutes excessive force." *Id.* In *Ortega*, the court concluded, where Ortega only complained of pain, that "it was not clearly established that applying zip ties too tightly violated the Fourth Amendment" and that the "defendant officers are entitled to qualified immunity." *Id.*[17]

Here, Plaintiff alleges only that the tight handcuffing resulted in bruising and pain.  There are no allegations of permanent injury.  Under these circumstances, there was not a clearly established right to be free from excessively tight handcuffs as of April 29, 2023.  *Id.*; *see Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (recognizing that because

---

[16] *See Buschmann v. Kan. City Bd. of Policy Comm'rs*, 76 F.4th 1081, 1085 (8th Cir. 2023) (affirming finding of qualified immunity); *Brown v. City of St. Louis*, 40 F.4th 895, 900 (8th Cir. 2022) (affirming finding of qualified immunity); *Kurtz v. City of Shrewsbury*, 245 F.3d 753 (8th Cir. 2001) (finding claim of false arrest failed because defendants had probable cause to arrest suspect; no discussion as to qualified immunity or clearly established rights).

[17] As to the first prong of the qualified immunity analysis—whether excessively tight handcuffs are sufficient to establish a constitutional violation for use of excessive force—many district courts in this circuit have concluded that excessively tight handcuffs do not establish a constitutional violation for excessive force absent some permanent injury.  *See Traylor v. Buck*, No. 24-cv-57 (NEB/LIB), 2025 WL 521139, at *2 (D. Minn. Feb. 18, 2025) ("[A]bsent evidence of "permanent injury," a single incident of painful handcuffing does not support an excessive force claim."); *Deaner v. Butler Cnty. Just. Ctr.*, No. 1:21-cv-40-SNLJ, 2021 WL 3709816, at *4 (E.D. Mo. Aug. 20, 2021).  The Court does not, and need not, reach the issue of whether Plaintiff has established a constitutional right was violated; here, it is enough to conclude that the manner in which Plaintiff alleges she was handcuffed did not violate a clearly established constitutional right.

16

"[h]andcuffing inevitably involves some use of force," to prove that the force applied in handcuffing a plaintiff was unconstitutionally excessive requires "something more" than "irritation, minor injury, or discomfort" that handcuffing "almost inevitably will result in"). Therefore, Defendant Officers are entitled to qualified immunity as to this part of Plaintiff's Fourth Amendment excessive force claim.[18]

### 2. Pushing Plaintiff into Jeep

Next, the Court considers Plaintiff's allegations that while handcuffed and being led to a patrol car, Deputy Ervin slammed Plaintiff's stomach into the handle of her Jeep with enough force to drop the magazine of his gun. While the video evidence does not blatantly contradict this version of events, the video evidence does show that Plaintiff attempted to grab her purse off the Jeep's hood, which Deputy Ervin then had to remove from her possession; Deputy Ervin directs Plaintiff to "stop walking away from me"; and Plaintiff yells for her neighbor to come help her. (Ex. A at 21:05:19-25.) Thus, the video evidence shows that Plaintiff was resisting Officer Ervin and being noncompliant with directions at the time she was allegedly slammed into the handle of the Jeep.[19]

Again, Plaintiff fails to carry her burden to show that it was clearly established that the foregoing facts are excessive force in violation of the Fourth Amendment. Nor has the Court independently found case law clearly establishing such a right where a suspect is resisting officers and being noncompliant with orders. *Cf. Pena v. City of Worthington*, No. 07-cv-1578 (JRT/FLN), 2008 WL 3262420, at *4 (D. Minn. Aug. 7, 2008) (finding excessive force clearly established where officer "forcefully shoved *a compliant, non-resistant* suspect into a door jam, well after he

---

[18] The Court notes that there is a clearly established right regarding complaints of pain which are ignored by officers. *See Ivey v. Williams*, No. 12-30 (DWF/TNL), 2017 U.S. Dist. LEXIS 222692, at *7-10 (D. Minn. Mar. 31, 2017). Many of these cases involve excessively tight handcuffs. However, Plaintiff does not plead in the Amended Complaint that she complained that the handcuffs were excessively tight and that any such complaint was ignored. Therefore, any such claim fails under Rule 12(b)(6). Apart from the facts pleaded in the Amended Complaint, the Court notes that the video evidence shows that Plaintiff did complain of wrist pain, but the audio clearly conveys that Deputy Geiger checked Plaintiff's cuffs and found that a finger fit between them and her wrists. *See Crawford v. Singleton*, No. 4:19-cv-04021, 2020 WL 1870767, at *8-9 (W.D. Ark. Mar. 24, 2020), *adopted by* 2020 WL 1865770 (W.D. Ark. Apr. 14, 2020) (dismissing excessive force claim where dash camera video of the incident demonstrated officer responded to complaints of pain and told plaintiff they could get a finger between the handcuffs and wrists).

[19] Plaintiff does not plead in the Amended Complaint that she was not resisting the officers at this moment; even if she did, such claim would be blatantly contradicted by the video evidence as described herein.

had been handcuffed and with sufficient force to cause a partial dislocation of the suspect's shoulder." (emphasis added)).

Because Plaintiff has failed to show a clearly established right as to this use of force, Defendant Officers are entitled to qualified immunity as to this part of Plaintiff's Fourth Amendment excessive force claim.

### 3. Taking Plaintiff to the Ground

Finally, the Court addresses Plaintiff's claim that Deputy Ervin and Deputy Geiger "placed their feet above the Plaintiff's feet and on the Plaintiff's shins to trip the Plaintiff" and "used their knees to push into the Plaintiff's calves," causing her to fall to the ground and hit her head, knocking her unconscious.[20]  Plaintiff further argues in her suggestions in opposition to Defendants' motion to dismiss that the deputies employed a tactic which made it appear that Plaintiff was resisting by tripping and pushing her.  The video evidence does not blatantly contradict Plaintiff's allegation that the tripping was intentionally done by the deputies.  Deputy Geiger's body camera footage does appear to show some sort of struggle right before Plaintiff ends up unconscious on the ground, but such struggle is not inconsistent with Plaintiff's allegations of what occurred.  Officer Defendants argue that Plaintiff was resisting orders and pulling away from the deputies at this time.  The video evidence does reflect that Deputy Geiger told Plaintiff to "let go" of the keys she was holding in her hand, and it is also apparent that Plaintiff did not immediately do so.  (Ex. A at 21:05:48 (Deputy Geiger can be heard asking about keys); Ex. B. at 21:06:38 (Deputy Geiger can be seen reaching for Plaintiff's hand to retrieve keys).)[21]  Plaintiff, however, was on the ground unconscious within seconds of the deputy's request to let go of the keys, and the Court cannot conclude whether Plaintiff was complying with the deputy's request from the video.  Although the video shows that Plaintiff earlier appeared resistant (by attempting

---

[20] At the motion to dismiss stage, the Court accepts as true Plaintiff's allegation that she was knocked unconscious as a result of being taking to the ground.  This does not preclude Defendants from controverting this fact at a later stage of this litigation.

[21] Exhibit A is the footage from Deputy Ervin's body camera.  It does not provide a visual depiction of Plaintiff's hands or any attempt by the deputies to retrieve the keys from Plaintiff.  However, Deputy Geiger can be heard requesting Plaintiff let go of the keys.  Conversely, Exhibit B is the footage from Deputy Geiger's body camera.  It provides a visual depiction of Plaintiff's hands and shows Deputy Geiger's attempt to retrieve the keys from Plaintiff.  However, Deputy Geiger's body camera footage does not contain any audio.  The Court has done its best to view these videos together to try and determine the series of events leading up to Plaintiff ending up on the ground.  However, at this motion to dismiss stage, the Court concludes that the videos do not blatantly contradict Plaintiff's version of events.

to grab her bag and by walking away from the officers as they were passing her Jeep), by this point Plaintiff was walking as guided by Deputy Ervin and was not yelling. Therefore, the Court construes the facts in the light most favorable to Plaintiff and proceeds on the basis that Plaintiff was handcuffed and not resisting the deputies at the time that she was purposefully tripped and taken to the ground, knocking her unconscious.

Accepting Plaintiff's Amended Complaint as true and giving her the benefit of all reasonable inferences, the Court finds that the facts as alleged (and not blatantly contradicted by the video) demonstrate the deprivation of a constitutional right that was clearly established as of April 29, 2023. "It was clearly established in 2009 that when a person is subdued and restrained with handcuffs, a 'gratuitous and completely unnecessary act of violence' is unreasonable and violates the Fourth Amendment." *Blazek v. City of Iowa City*, 71 F.3d 920, 925 (8th Cir. 2014) (quoting *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006)). In *Blazek*, the court concluded that if the officers "grabbed [Blazek] by the arms and gratuitously 'jerked' him from the floor onto the bed, using enough violent force to cause significant injury" while he was subdued, compliant, and in handcuffs, that would contravene clearly established law. *Id.*; *see also Henderson*, 439 F.3d at 503 (concluding pepper spraying a restrained and subdued suspect may have been a gratuitous and completely unnecessary act of violence which clearly violated the Fourth Amendment, but concluding issues of fact (whether suspect was subdued, for example) precluded summary judgment on issue of qualified immunity); *Stewardson v. Cass County*, No. 3:18-cv-958-DRL-MGG, 2021 WL 4806373, at *3 (N.D. Ind. Oct. 14, 2021) (noting that if officer "tripped and slammed a handcuffed [suspect] onto the ground," that would have "been obvious as a violation" of the Fourth Amendment).

Therefore, the Court concludes that Deputy Ervin and Deputy Geiger are not entitled to qualified immunity as to Plaintiff's Fourth Amendment excessive force claim based on her allegation that the deputies purposefully tripped Plaintiff and pushed her to the ground after she had been secured in handcuffs, knocking her unconscious. As previously discussed, Plaintiff pleaded a claim against Lieutenant Parrott for failure to intervene to stop the excessive use of force. The Court similarly concludes that he is not entitled to qualified immunity as to this alleged use of

19

force.[22]  Accordingly, Defendants' motion to dismiss Count 1 is **DENIED** as to Plaintiff's Fourth Amendment excessive force claim based on Plaintiff being taken to the ground.

### B.    Count 2 – "Statutory Civil Rights" Against Officer Defendants

In Count 2, "Plaintiff sues Pulaski County Officers for violation of her statutory civil rights." (Doc. 4 at 6.)  Plaintiff fails to cite specific statutory authority upon which she bases her claim.  As best as the Court can discern, Plaintiff is invoking 42 U.S.C. § 1983, as she claims the Officer's actions were done with "actual malice . . . for Plaintiff's constitutional rights." (*Id.*)  In Plaintiff's suggestions in opposition to Defendants' motion to dismiss, Plaintiff merely refers to her arguments in support of Count 1, (Doc. 26 at 3-39), to support Count 2, (*id.* at 39 ("Stated in Section 111.B.1.")).  Therefore, insofar as Plaintiff intended to invoke 42 U.S.C. § 1983 in Count 2, it is redundant of Count 1 and is therefore **DISMISSED**.  Insofar as Plaintiff intended to invoke any other statutory civil right in Count 2, it is **DISMISSED** for failure to state a claim.

### C.    Count 3 – *Monell* Claim Against Pulaski County

In Count 3, Plaintiff asserts a *Monell* claim for municipal liability against Pulaski County.  Plaintiff alleges in the Amended Complaint that Pulaski County has a "policy and practice" (1) "to authorize, acquiesce to, and cover up the use of excessive force," and (2) to "authoriz[e] its officers to verbally abuse detainees . . . ." (Doc. 4 at 6.)  Plaintiff also alleges that Pulaski County "failed to adequately train, direct, supervise, or control Defendant Officers concerning the use of excessive force and verbal abuse." (*Id.*)

"Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978), and *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (cleaned up).  In other words, "[u]nder 42 U.S.C. § 1983, a municipality may not be held vicariously liable for the unconstitutional acts of employees," unless "the unconstitutional acts of its officials or employees . . . implement or execute an unconstitutional municipal policy or custom." *Mettler v. Whitledge*, 165 F.3d 1197,

_____

[22] The Court emphasizes that its qualified immunity analysis herein is based upon the facts properly before the Court at the motion to dismiss stage (in other words, the only "facts" the Court considers at this stage are (1) the Plaintiff's allegations and (2) video evidence, but only to the extent the video evidence blatantly contradicts Plaintiff's allegations).  Nothing in this Order precludes Defendants from asserting qualified immunity at a later stage in the proceedings based on the record before the Court at that time.

1204 (8th Cir. 1999). Moreover, "the municipal policy or custom must be the 'moving force' behind the alleged injury." *Jackson v. City of Maplewood*, 4:24-cv-01207-NCC, 2025 WL 2299393, at *7 (E.D. Mo. Aug. 7, 2025).

"In the context of § 1983 municipal liability, the term 'policy' refers to 'official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters.'" *Brown v. City of St. Louis*, No. 4:18-cv-1676 (JMB), 2019 WL 3577491, at *4 (E.D. Mo. Aug. 6, 2019) (quoting *Corwin v. City of Independence*, 829 F.3d 695, 700 (8th Cir. 2016)). Beyond the conclusory statement that Pulaski County has a policy to "cover up the use of excessive force" and a "policy and practice of authorizing its officers to verbally abuse detainees," Plaintiff's Amended Complaint identifies no official policy that she alleges is unconstitutional. *See Anzaldua v. Ne. Amb. & Fire Prot.*, 978 F. Supp. 2d 1016, 1023 (E.D. Mo. 2013) (finding the allegation that "the [defendant] has a policy and/or custom of punishing employees for speech made as private citizens about issues and matters of public concern" insufficient to plead an official policy). Nor does the Amended Complaint suggest that a municipal official with final authority implemented such an official policy.[23]

Consequently, the Court must determine whether the Amended Complaint sufficiently alleges the existence of an unofficial custom or a deliberately indifferent failure to train or supervise. To establish an unofficial custom, Plaintiff must show:

(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) an injury by acts pursuant to the governmental entity's custom.

*Poemoceah v. Morton County*, 117 F.4th 1049, 1057 (8th Cir. 2024) (internal quotation marks omitted) (cleaned up). Plaintiff does not allege facts establishing any such pattern of conduct. Outside Plaintiff's own experience on April 29, 2023, Plaintiff does not point to specific instances where Pulaski County Officers or officials have engaged in the use of excessive force or verbal abuse. *See id.* (finding failure to allege facts establishing a pattern of conduct where plaintiff only

---

[23] Plaintiff's suggestions in opposition to Defendants' motion to dismiss argues that Sheriff Jimmy Bench is a final policymaker. (Doc. 26 at 46.) However, in Plaintiff's Amended Complaint, Sheriff Bench is not mentioned, and Plaintiff did not allege that Sheriff Bench had any actual involvement in her arrest; nor does she plead any facts showing an official policy. Her conclusory statements are insufficient to state a claim.

pleaded facts about his own experience).[24]  Generally, a single instance of alleged misconduct is insufficient to plead an unofficial custom.  *See Sarich v. City of St. Louis*, No. 4:23-cv-00943-SEP, 2025 WL 901276, at *3 (E.D. Mo. Mar. 25, 2025) (finding that plaintiff failed to plead unofficial custom and thus dismissing *Monell* claim where plaintiff "offers only one prior instance of alleged misconduct").  Plaintiff's allegations pertaining only to her experience on April 29, 2023, "fail to state sufficient facts to support the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct," to give rise to an unofficial custom.  *Id.*

Plaintiff also alleges in Count 3 that "the Sheriff's Department failed to adequately train, direct, supervise or control Defendant Officers concerning the use of excessive force and verbal abuse."  (Doc. 4 at 6.)  However, this too is inadequately pleaded.

> A failure to train is actionable under § 1983 if, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need."

*Poemoceah*, 117 F.4th at 1057-58 (quoting *City of Canton*, 489 U.S. at 390).  Plaintiff makes no allegations that the "need for training was so obvious that any of the individual defendants were deliberately indifferent to it."  *Id.*  Plaintiff's allegations of "failure to train" in the Amended Complaint are conclusory, threadbare recitals of the elements required to state a claim.[25]

Plaintiff has failed to plausibly plead facts establishing or giving rise to an inference of an unconstitutional policy or custom or a deliberate indifference to the need for training required to state a *Monell* claim against Pulaski County.  Plaintiff also failed to plead that any such policy or custom was the moving force behind any alleged constitutional violation.  *Jackson*, 2025 WL 2299393, at *7.  Therefore, Count 3 of the Amended Complaint is **DISMISSED**.

---

[24] In her suggestions in opposition, Plaintiff references an incident regarding Louis Houston and attaches Exhibit KK, a video regarding the same incident.  These facts are not pleaded in the Amended Complaint, and the Court cannot consider this incident in resolving the motion to dismiss.  Moreover, even if the Court did consider this additional incident, it appears to be a video from April 27, 2023—after the incident giving rise to this lawsuit.  "[P]ost injury wrongful conduct cannot be the moving force behind the injury at issue."  *Jackson v. City of Maplewood*, No. 4:24-cv-01207-NCC 2025 WL 2299393, at *8 (citing *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999)).

[25] (*See also* Doc. 4 at 7 (Count 10: "Sheriff Department was negligent in that it failed to provide adequate training, supervision, and control of Defendant Officers"); *id.* at 8 (Count 11: "Plaintiff claims she is entitled to punitive and exemplary damages from the Sheriff Department for its failure to adequately train and supervise Defendant Officers.").)

22

### D.	Count 4 – Conspiracy under 42 U.S.C. §§ 1981, 1983, and 1985

In Count 4, Plaintiff alleges all Defendants "conspired to violate her constitutional and statutory civil rights in violation of 42 U.S.C. §§ 1981, 1983, and 1985, and the Equal Protection and Privileges and Immunities Clause of the Fourteenth Amendment."  (Doc. 4 at 6.)

#### 1.	42 U.S.C. § 1981

Plaintiff has failed to plausibly plead a claim for relief under 42 U.S.C. § 1981.  "Section 1981 protects the rights of citizens belonging to protected classes 'to make and enforce contracts.'" *Spirit Lake Tribe of Indians v. NCAA*, 715 F.3d 1089, 1092 (8th Cir. 2013) (quoting 42 U.S.C. § 1981).  The Eighth Circuit

> has identified several elements to a claim under § 1981, which we divided into four parts for analysis: (1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant.

*Id.* (quoting *Gregory v. Dillards, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009) (en banc)).  The relevant "protected activity" for purposes of a § 1981 claim is "the making and enforcement of contracts." *Austell v. City of Pagedale*, No. 4:22-cv-01006-AGF, 2023 WL 4864534, at *7 (E.D. Mo. July 31, 2023) (quoting *Daniel v. Dillards, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004)).  Here, Plaintiff has not pleaded any facts indicating that she engaged in the relevant protected activity, as there is no contract or attempt to contract mentioned throughout the Amended Complaint.  Therefore, Plaintiff has failed to state a claim under 42 U.S.C. § 1981.

#### 2.	42 U.S.C. §§ 1983 and 1985

Plaintiff has also failed to plausibly plead a claim for conspiracy to violate constitutional rights under §§ 1983 or 1985 because Plaintiff failed to plead facts suggesting that Defendants conspired, or came to a meeting of the minds, to violate Plaintiff's constitutional rights.

A conspiracy claim under 42 U.S.C. § 1983 requires a plaintiff to establish: "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured the plaintiff."  *Childers v. Does*, No. 4:24-cv-00264-BSM-JTK, 2024 WL 2337729, at *2 (E.D. Ark. Apr. 30, 2024) (quoting *Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 798 (8th Cir. 2013)).  "A claim of conspiracy must be supported by factual allegations sufficient to suggest that 'the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding' and 'meeting of the minds.'"  *Id.* (quoting *Smith v. Bacon*, 699 F.2d

434, 436 (8th Cir. 1983)). Similarly, the first element required to state a claim for conspiracy under 42 U.S.C. § 1985 is that "the defendants conspired." *Potter v. St. Charles County*, No. 4:23-cv-1511-RLW, 2024 WL 324091, at *3 (E.D. Mo. Jan. 29, 2024) (internal quotation marks omitted), *aff'd*, No. 24-1492, 2024 WL 4102029 (8th Cir. May 14, 2024). "To satisfy the first element, a plaintiff must allege the defendants did conspire,' that is, allege that an agreement existed between the defendants in the conspiracy." *Id.* (citing *Andrews v. Fowler*, 98 F.3d 1069, 1079 (8th Cir. 1996)). A plaintiff "must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Kelly v. City of Omaha*, 813 F.3d 1070, 1077-78 (8th Cir. 2016) (internal quotation marks omitted).

Here, Plaintiff's conclusory allegations are insufficient to support a §§ 1983 or 1985 conspiracy claim because the allegations fail to plausibly suggest that Defendants reached any agreement. *Id.*; *see also Nelson v. McGehee*, 876 F.2d 56, 59 (8th Cir. 1989) ("[A]llegations of a conspiracy must be pleaded with sufficient specificity and factual support to suggest a meeting of the minds directed toward an unconstitutional action.") (internal quotation marks omitted). Stating that Defendants "conspired" is a bare recitation of the first element of §§ 1983 and 1985 conspiracy claims and does not meet the requirement to "allege with particularity and specifically demonstrate with material facts" that Defendants reached an agreement. *Kelly*, 813 F.3d at 1077-78; *Nelson*, 876 F.2d at 59; *see also Dukeman v. Ste. Genevieve County*, No. 1:24-cv-00149-NCC, 2025 WL 895327, at *13-14 (E.D. Mo. Mar. 24, 2025) (dismissing § 1985 claim for failure to allege specific and material facts demonstrating defendants came to an agreement where plaintiff only pleaded defendants "agree[d] together to write false police reports"). Therefore, Count 4 of the Amended Complaint is **DISMISSED** for failure to state a claim.

### E. Count 5, Count 6, and Count 9 – Respondeat Superior Against Pulaski County for Intentional Torts, Excessive Force, and Negligence by Employee Officers

In Count 5, Count 6, and Count 9, Plaintiff asserts claims for respondeat superior liability for (1) "the intentional torts committed by Defendant Officers" (Count 5), (2) the intentional torts of Defendant Officers, specifically "the use of excessive force in the line of duty" (Count 6), and (3) Officer Defendants' "negligence" (Count 9). (Doc. 4 at 7.) Defendants argue that sovereign immunity bars Plaintiff's claims against Pulaski County for respondeat superior liability for its employees' intentional torts, excessive force, and negligence. The Court agrees.

To the extent Plaintiff seeks to state a claim for respondeat superior against Pulaski County under 42 U.S.C. § 1983, that claim fails because claims for respondeat superior are not recognized

24

under 42 U.S.C. § 1983. *See Furlow v. Belmar*, 52 F.4th 393, 406 (8th Cir. 2022) ("[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." (quoting *Monell*, 436 U.S. at 691)).[26]

As to Plaintiff's claim of respondeat superior against Pulaski County based on Missouri state law claims for intentional torts, sovereign immunity bars such claims. *See Bennartz v. City of Columbia*, 300 S.W.3d 251, 161 (Mo. Ct. App. 2009) ("[S]overeign immunity shields municipalities from liability even from intentional torts."); *see also White v. Dulany*, No. 2:21-cv-04103-MDH, 2021 WL 4303602, at *8 (W.D. Mo. Sept. 21, 2021) (construing official capacity claim against officer for intentional tort as a claim against the city and concluding that the claim was barred by sovereign immunity). Sovereign immunity also bars Plaintiff's claim of respondeat superior against Pulaski County based on negligence. *Moses v. County of Jefferson*, 910 S.W.2d 735, 736 (Mo. Ct. App. 1995) ("A Missouri county enjoys sovereign immunity against claims for the negligence of its employees." (citing *Wood v. County of Jackson*, 463 S.W.2d 834 (Mo. 1971)).

Plaintiff "ha[s] the burden of proving the [sovereign] waived its sovereign immunity." *Newsome v. Kansas City*, 520 S.W.3d 769, 775 (Mo. 2017). Plaintiff did not plead an exception to sovereign immunity[27] or respond to Defendants' arguments regarding sovereign immunity in her suggestions in opposition to the motion to dismiss. Therefore, Count 5, Count 6, and Count 9 are **DISMISSED**.[28]

### F.    Count 7 – Negligence Against Officer Defendants

In Count 7, "Plaintiff claims that Defendant Officers were negligent when they used excessive force against her." (Doc. 4 at 7.) Officer Defendants argue that Plaintiff's negligence claim should be dismissed for failure to state a claim because a theory of negligence is

---

[26] As previously discussed, municipalities may only be held liable pursuant to § 1983 if the plaintiff can establish an official policy, unofficial custom, or a "deliberately indifferent failure to train or supervise." *Atkinson*, 709 F.3d at 1214. The Court has previously considered Plaintiff's claims against Pulaski County pursuant to *Monell* liability and concluded that Plaintiff has failed to state a claim for relief on that basis.

[27] "The only exceptions to sovereign immunity in Missouri are for 'tort claims arising from the negligent operation of motor vehicles by public employees and from the dangerous condition of a public entity's property if and to the extent that the public entity has acquired liability insurance.'" *Lind v. McKinney*, No. 18-cv-03125-SRB, 2018 WL 11474988, at *4 (W.D. Mo. Oct. 29, 2018) (quoting *Edwards v. McNeill*, 894 S.W.2d 678, 682 (Mo. App. W.D. 1995)). Neither of these exceptions apply in this case.

[28] Defendants also argue that Plaintiff's claim for "intentional tort" is barred by Missouri's two-year statute of limitation. The Court need not reach this issue here.

contradictory to Plaintiff's theory of intentional torts and because Officer Defendants are entitled to official immunity.

As to Officer Defendants' first argument, it is true that "[a] plaintiff cannot recover under a negligence theory if the only evidence is that of an intentional tort." *Jones v. Marshall*, 750 S.W.2d 727, 728 (Mo. Ct. App. 1988); *see also Friday v. McClure*, 536 S.W.3d 235, 239 (Mo. Ct. App. 2017) ("[T]he theories of negligence and intentional tort are contradictory and mutually exclusive." (internal quotation marks omitted)). However, Plaintiff is not barred from pleading alternative theories of recovery at this early stage of litigation. *See* Fed. R. Civ. P. 8(d) ("A party may state as many separate claims or defenses as it has [in its pleadings], regardless of consistency."). The federal pleading standards clearly permit pursuing conflicting theories of recovery at the pleadings stage.

Officer Defendants' argument regarding official immunity is more persuasive. "Under Missouri law, official immunity 'protects public officials sued in their individual capacities from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts.'" *Harmon v. Preferred Fam. Healthcare, Inc.*, 125 F.4th 874, 885 (8th Cir. 2025) (quoting *State ex rel. Love v. Cunningham*, 689 S.W.3d 489, 494-95 (Mo. 2024)). "This immunity protects individual government actors who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties by allowing the officials to make judgments affecting the public safety and welfare without the fear of personal liability." *Id.* (internal quotation marks omitted). "There are two narrow exceptions to Missouri's official immunity: (1) when the official fails to perform a ministerial duty required by law, and (2) when the official acts in bad faith or with malice." *Id.* at 886.

Here, as to Count 7, Plaintiff has failed to plead any violation of a ministerial duty or that the alleged negligence was done with malice or in bad faith. "Under Missouri law, a plaintiff must plead facts establishing an exception to official immunity. Absent these allegations, the pleadings are insufficient to state a claim which is not barred by the doctrine of official immunity as a matter of law." *Id.* (internal citation omitted) (cleaned up). Therefore, Plaintiff's pleadings fail to state a claim against Officer Defendants for negligence that is not barred by official immunity under Missouri law, and Count 7 is **DISMISSED**.

26

### G. Count 8 and Count 11 – Punitive Damages Against "Defendant" and Pulaski County

In Count 8, Plaintiff vaguely "seeks exemplary and punitive damages from Defendant" arising from the alleged negligence and disregard for her constitutional rights. (Doc. 4 at 7.) Plaintiff fails to clearly assert this claim against any particular Defendant. As best as the Court can discern, Plaintiff meant to assert a claim for punitive damages against Officer Defendants in this Count, as Plaintiff asserts a claim for punitive damages against Pulaski County in Count 11.

"Punitive damages do not constitute an independent cause of action" and are instead "incident to the underlying cause of action." *Amesquita v. Gilster-Mary Lee Corp.*, 408 S.W.3d 293, 305 (Mo. Ct. App. 2013); *see also Otey v. Nationstar Mortg., LLC*, No. 2:24-cv-04041-MDH, 2024 WL 4436868, at \*3 (W.D. Mo. Oct. 7, 2024) ("There is no independent cause of action for punitive damages under either federal or Missouri law."). Thus, Count 8 and Count 11 are **DISMISSED** because a request for punitive damages is not an independent cause of action.[29]

### H. Count 10 – Negligent Training, Supervision, and Control Against Pulaski County

In Count 10, Plaintiff asserts a claim for negligence against Pulaski County stating it was "negligent in that it failed to provide adequate training, supervision and control of Defendant Officers, and that Plaintiff was injured as a result of that failure." (Doc. 4 at 7.) As best as the Court can discern, Plaintiff relies on Missouri law in asserting this negligence claim against Pulaski County.[30] As previously discussed in relation to Plaintiff's claims against Pulaski County based on a respondeat superior theory, sovereign immunity bars any state law negligence claim against Pulaski County. *Moses*, 910 S.W.2d at 736 ("A Missouri county enjoys sovereign immunity against claims for the negligence of its employees."). Plaintiff did not plead an exception to sovereign immunity. *Newsome*, 520 S.W.3d at 775. Thus, Count 10 is **DISMISSED**.

---

[29] Moreover, Defendants argue that Count 11 should be dismissed because Plaintiff's claim for punitive damages against Pulaski County is barred by "federal immunity and sovereign immunity." (Doc. 9 at 15.) *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 ("[W]e hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983."); Mo. Rev. Stat. § 537.610.3. The Court agrees and would alternatively dismiss Count 11 on this basis.

[30] To the extent Plaintiff intended to invoke 42 U.S.C. § 1983 and municipal liability pursuant to *Monell* in this Count, the Court would dismiss this claim for the reasons explained above with reference to Count 3.

27

## I.     Count 12 – Malicious Abuse of Process, False Arrest, and False Imprisonment

### 1.     Malicious Abuse of Process

In Count 12 of the Amended Complaint, Plaintiff asserts a malicious abuse of process by Officer Defendants, claiming generally that they "used the criminal process against her in order to intimidate her and dissuade her from asserting her rights." (Doc. 4 at 8.) Plaintiff does not specify whether she asserts the claim for abuse of process under federal or state law. Regardless, the Court finds Plaintiff has failed to state a claim for abuse of process.

"[A] section 1983 claim for malicious abuse of process lies where 'prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law.'" *Talbert v. Ciglar*, No. 18-2518, 2019 WL 653219, at *5 (E.D. Pa. Feb. 15, 2019) (citing *Rose v. Bartle*, 871 F.2d 331, 350 N.17 (3d Cir. 1989)). To establish an abuse of process claim, "there must be some proof of a definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of [the] process." *Id.* (cleaned up).[31]

Under Missouri law, a plaintiff must establish the following elements for a claim of abuse of process: "(1) the defendant made an illegal or improper or perverted use of the process; (2) such use was neither warranted nor authorized by the process; (3) the defendant had an improper purpose in exercising the use of process; and (4) damage resulted." *Washington v. DEA*, 183 F.3d 868, 875 (8th Cir 1999) (citing *Ritterbusch v. Holt*, 789 S.W.2d 491, 493 (Mo. banc 1990)). "Under Missouri law, the tort[] of abuse of process . . . require[s] the initiation of legal proceedings against the plaintiff by the defendant." *Alston v. City of St. Louis*, No. 4:18-cv-01569-AGF, 2021 WL 4476690, at *11 (E.D. Mo. Sept. 30, 2021) (citing *Trs. of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, 585 S.W.3d 269, 277 (Mo. 2019)).

Thus, a claim for abuse of process under federal or state law requires showing a prosecution was initiated against the plaintiff by the defendant. In the Amended Complaint, Plaintiff has not alleged that any Defendant used any legal process whatsoever, let alone plead that any Defendant initiated a complaint or prosecution against Plaintiff in a court contending Plaintiff engaged in a

---

[31] It is unclear whether the Eighth Circuit would recognize an abuse of process claim under § 1983. *See Fagnan v. City of Lino Lakes*, 745 F.3d 318, 324 n.5 (8th Cir. 2014) (declining to decide whether an abuse of process claim is cognizable under § 1983 and finding the plaintiff would fail to show necessary elements of such a claim even if it were cognizable). The Court finds, even assuming the Eighth Circuit would recognize such a claim, that Plaintiff has failed to plausibly plead the claim.

criminal act or violation of the law. Therefore, Plaintiff has failed to state a claim for abuse of process, and Count 12 is **DISMISSED** as to this claim.

### 2. False Arrest and False Imprisonment

Plaintiff also claims that "Defendant Officers falsely arrested her and falsely imprisoned her." (Doc. 4 at 8.) Under Missouri law, false arrest and false imprisonment are interchangeable and the elements of both are "the confinement, without legal justification, by the wrongdoers of the person wronged." *See Highfill v. Hale*, 186 S.W.3d 277, 280 (Mo. 2006). "A claim for false arrest must . . . be brought within two years." *Holloway v. Ameristar Casino St. Charles, Inc.*, No. 4:07-cv-218-DDN, 2007 WL 2199566, at *2 (E.D. Mo. July 27, 2007) (citing Mo. Rev. Stat. § 516.140). Plaintiff's allegations of false arrest arise from the incident on April 29, 2023. Plaintiff pleads no facts indicating that she remained under arrest or was otherwise detained after April 29, 2023. Plaintiff did not file the pro se motion for leave to proceed *in forma pauperis*, proposed complaint, and financial affidavit in this case until May 1, 2025. (Doc. 1.)

Defendants argue that Plaintiff's claims as to false arrest and false imprisonment should be dismissed because her claims are barred by Missouri's two-year statute of limitations. In response, Plaintiff argues that she waited until the last minute to file the lawsuit to avoid the Pulaski County Sheriff's Department filing criminal charges against her in retaliation and that a power outage at the Springfield Courthouse on April 29, 2025, prohibited her from filing within the two-year limitations period. However, Plaintiff has not provided any evidence or case law to suggest that the circumstances allow the statute of limitations to be tolled. Nor has Plaintiff suggested what prosecution she feared in retaliation which would have been avoided by waiting to file her lawsuit until the two-year anniversary of the incident. *See* Mo. Rev. Stat. § 556.036 (statute of limitations generally 6 months for infractions, one year for misdemeanors, and three years for felonies).

Even if Plaintiff had asserted this claim within the statute of limitations or shown that the statute of limitations should be tolled, the Court has concluded that Officer Defendants had probable cause to arrest Plaintiff. Therefore, Plaintiff cannot state a claim for false arrest, which requires showing "confinement, without legal justification." *Highfill*, 186 S.W.3d at 280; *see also Brown v. City of St. Louis*, No. 4:18-cv-00389-MTS, 2021 WL 2413364, at *6 (E.D. Mo. June 14, 2021) ("Given the Court's conclusion that probable cause existed to arrest Plaintiff, his restraint was lawful, and his claim for false arrest under Missouri law necessarily fails."). Therefore, Count 12 is **DISMISSED** as to Plaintiff's claim for false arrest and false imprisonment.

**Conclusion**

Accordingly, after careful consideration and for the reasons explained above, the Court **ORDERS** that Defendants' motion to dismiss, (Doc. 7), is **GRANTED in part** and **DENIED in part**. Defendants' motion to dismiss is **DENIED** as to Count 1 asserting a Fourth Amendment excessive force claim based on Plaintiff being taken to the ground.[32] Defendants' motion to dismiss is otherwise **GRANTED**, Count 1 is **DISMISSED** except as stated herein, and Counts 2-12 are **DISMISSED** in full.

      **IT IS SO ORDERED.**

 

 

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED:  February 18, 2026

---

[32] This Fourth Amendment excessive force claim based on Plaintiff being taken to the ground remains pending against Deputies Ervin and Geiger (for their alleged direct use of force) and Lieutenant Parrott (based on a theory of failure to intervene) in their individual capacities.  No other claims remain in this case.  Therefore, the County of Pulaski, Missouri, is **DISMISSED**, as no claims remain against it.

30