# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

SHAVONNE HALTERMAN,    )
         )
      Plaintiff,    )
         )
      v.    )    No. 6:25-cv-03101-RK
         )
RYAN ERVIN, et al.,    )
         )
      Defendants.    )

## <u>ORDER</u>

Before the Court is Defendants' motion for summary judgment. (Doc. 37.) The motion is fully briefed. (Docs. 39, 52, 53.) After careful consideration and for the reasons explained below, Defendants' motion for summary judgment is **GRANTED**.

## Background and Procedural Posture

This pro se civil rights case arises out of an incident on April 29, 2023, which began when the Pulaski County Sheriff's Department responded to a phone call placed by Plaintiff Shavonne Halterman requesting protection from "intruders" at her residence and resulted in Plaintiff's arrest.

### I. Procedural Posture

Plaintiff, proceeding pro se, filed this lawsuit against Pulaski County, Lieutenant Brett Parrott, Deputy Ryan Ervin, and Deputy Lee Geiger, asserting twelve counts arising from the incident on April 29, 2023. (*See generally* Doc. 4.) Defendants filed a motion to dismiss on July 15, 2025. (Doc. 7.) While the motion to dismiss was still pending, and four months before fact and expert discovery was then set to close,[1] Defendants filed the instant motion for summary judgment. (Doc. 37.) After Defendants filed the motion for summary judgment, the Court ruled on Defendants' pending motion to dismiss. (Doc. 49.)

---

[1] The Court entered a Scheduling Order on August 25, 2025, which made fact and expert discovery due on April 29, 2026. (Doc. 23.) On April 2, 2026, the Court entered an Amended Scheduling Order, under which discovery is not due until September 25, 2026. (Doc. 58.)

Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, the Court may defer considering a motion for summary judgment or allow time to take discovery if "a non-movant shows by affidavit or declaration that . . . it cannot present facts essential to justify its opposition." However, Plaintiff has not filed such an affidavit or declaration pursuant to Rule 56(d).

As a result of the motion-to-dismiss Order, the only remaining claim is part of Count 1, asserting a 42 U.S.C. § 1983 claim for excessive force in violation of the Fourth Amendment based on Plaintiff being taken to the ground while in handcuffs. (Doc. 49 at 30.) This claim currently remains pending against Deputies Ervin and Geiger (for their alleged direct use of force) and Lieutenant Parrott (on a theory of failure to intervene) in their individual capacities. (*Id.* at 30 n.32.)[2] Defendants move for summary judgment on Count 1 arguing that Plaintiff has not followed the Local Rules and Federal Rules of Civil Procedure in contesting summary judgment and that Defendants are entitled to qualified immunity.

## II.    Non-Compliance with Local Rule 56.1

As an initial matter, the Court notes that Plaintiff failed to comply with Local Rule 56.1(b) when filing her suggestions in opposition to summary judgment. Local Rule 56.1 sets out the manner in which a motion for summary judgment and opposing suggestions should be filed in this Court, as follows:

> **(a) Supporting Suggestions.** A party moving for summary judgment must begin its supporting suggestions with a concise statement of uncontroverted material facts. Each fact must be set forth in a separately numbered paragraph and supported in accordance with Fed. R. Civ. P. 56(c).
>
> **(b) Opposing Suggestions.**
>
>> **1.** A party opposing a motion for summary judgment must begin its opposing suggestions by admitting or controverting each separately numbered paragraph in the movant's statement of facts. If the opposing party controverts a given fact, *it must properly support its denial in accordance with Fed. R. Civ. P. 56(c)*. Unless specifically controverted by the opposing party, all facts set forth in the statement of the movant are *deemed admitted for the purpose of summary judgment*.
>>
>> **2.** If the opposing party relies on any facts not contained in the movant's suggestions, the party must add a concise listing of material facts. Each fact in dispute must be set forth in a separately numbered paragraph and properly supported in accordance with Fed. R. Civ. P. 56(c).

Local Rule 56.1 (emphasis added).

In turn, Rule 56(c) of the Federal Rules of Civil Procedure requires that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by[] citing to particular parts of materials in the record." "These requirements help to 'distill to a manageable volume the matters

---

[2] No claims against Pulaski County, Missouri, survived the motion-to-dismiss stage, and the Court therefore dismissed Pulaski County as a Defendant. (Doc. 49 at 30 n.32.)

that must be reviewed by a court undertaking to decide whether a genuine issue of fact exists for trial.'" *Nelson v. S. Poverty L. Ctr.*, 513 F. Supp. 3d 1101, 1106 (W.D. Mo. 2021) (quoting *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (finding district court did not abuse its discretion by determining Jones' statement of uncontroverted facts and response to UPS's controverted facts violated Local Rule 56.1, disregarding Jones' statement of facts, and admitting UPS's statement of uncontroverted facts)).

Plaintiff failed to properly respond to Defendants' statement of uncontroverted material facts. Defendants' suggestions in support of summary judgment include nine separately numbered paragraphs of facts and supports those facts with citation to the record. (Doc. 39 at 5-7.) While Plaintiff attempts to challenge some of Defendants' facts in her suggestions in opposition, she fails to cite any particular parts of material in the record as required by the Federal Rules of Civil Procedure and this Court's Local Rules. While "pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law." *Nelson*, 513 F. Supp. 3d at 1105 (quoting *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984)) (applying Rule 56(c) and Local Rule 56.1(b) to pro se plaintiff's summary judgment opposition and admitting defendant's statement of uncontroverted facts).

Accordingly, for purposes of summary judgment, the Court deems admitted Defendants' statement of uncontroverted material facts to the extent that the facts do not assert legal conclusions.[3] "A party cannot dictate a court's resolution of a legal issue by labeling it as a statement of fact and asking the court to deem it admitted." *Atmosphere Hospitality Mgmt., LLC v. Shiba Invs., Inc.*, 158 F. Supp. 3d 837, 852 (D.S.D. 2016); *see also Carpenters Dist. Council of Kan. City Pension Fund v. Fry*, No. 08-cv-00296-DGK, 2009 U.S. Dist. LEXIS 148891, at *3 n.2 (W.D. Mo. Sept. 18, 2009) (disregarding for purposes of summary judgment "legal conclusion[s] or argument offered as a statement of fact").

---

[3] In particular, the Court does not deem admitted Defendants' statement of "fact" that "[o]n April 29, 2023, any force used related to Shavonne Halterman was reasonable under the circumstances." (Doc. 39 at 7, ¶ 8.) The Court independently conducts a reasonableness analysis below.

### III. Summary Judgment Background and Facts[4]

On April 29, 2023, at about 7:43 pm, Plaintiff Shavonne Halterman called the Pulaski County Sheriff's Department for protection from multiple "intruders" at her residence.[5]  In response to Plaintiff's call, Deputy Ervin, Deputy Geiger, and Lieutenant Parrott arrived at Plaintiff's residence in multiple vehicles, which were parked on the street at the top of the residence's driveway.  Lieutenant Parrott, Deputy Ervin, and Deputy Geiger were all employed by Pulaski County, Missouri, and were acting in the course of their respective offices as sheriff deputies when they responded to Plaintiff's residence on April 29, 2023.  (Doc. 39 at 7, ¶ 9; Docs. 39-4, 39-5, 39-6.)  Body cameras worn by Deputy Ervin, Deputy Geiger, and Lieutenant Parrott recorded the ensuing interaction, which lasted more than an hour and a half.[6]

Outside Plaintiff's residence, Deputy Ervin conversed with one of the "intruders," Bobby Lee Halterman, who provided personal identification and a deed purportedly indicating his ownership of the house.  (Doc. 9-1, Ex. A at 19:57:15-20, 19:59:20-40.)  Mr. Halterman was attempting to remove his truck from the driveway and retrieve his work items and clothes from inside the house.  (Doc. 9-1, Ex. A at 20:01:15-27.)  Mr. Halterman repeatedly informed Deputy Ervin that Plaintiff was violent and physical with others.  (Doc. 9-1, Ex. A at 19:57:05-12, 20:05:21-40, 20:07:13-20, 20:51:10-15.)

Within thirty minutes of arriving at Plaintiff's residence, Deputy Ervin gave Mr. Halterman permission to enter the residence to retrieve his clothes.  Plaintiff refused to comply and permit

---

[4] Unless otherwise noted, these facts are taken from the video evidence in the record and Defendants' statement of uncontroverted material facts.  As discussed below, the facts are viewed "in the light depicted by the videotape" where it clearly contradicts Plaintiff's version of events.  *Leask v. City of Minneapolis*, 172 F.4th 598, 600 (8th Cir. 2026).

[5] The "intruders" referenced in Plaintiff's Amended Complaint are Bobby Lee Halterman and three younger family members, two women and a man.  However, apart from Bobby Lee Halterman, the parties have not further addressed the identity of these individuals in the summary judgment record.

[6] This includes body camera footage of Deputy Ervin, (Doc. 9-1, Ex. A), Deputy Geiger, (Doc. 39-1, Ex. A1; Doc. 39-2, Ex. A2), and Lieutenant Parrott, (Doc. 33-1, Ex. NN; Doc. 33-2, Ex. OO; Doc. 33-3, Ex. PP).  The Court notes that the body camera footage of Deputy Geiger does not contain audio, and that there are slight discrepancies in the time-stamps (time of day) among the officers' footage.  Apart from these points, Plaintiff has not meaningfully contested the accuracy or authenticity of the video evidence, and the Court considers the body camera footage in resolving the instant motion as incorporated into Defendants' statement of uncontroverted material facts.  (Doc. 39 at 5-6, ¶¶ 1-3.)

Mr. Halterman to enter, despite hearing Deputy Ervin give him permission to do so three times. (Doc. 9-1, Ex. A at 20:12:45-15:23.) The deputies told the other individuals on the scene that only Mr. Halterman could access the residence. (Doc. 9-1, Ex. A at 20:15:20-30.) Mr. Halterman did not enter the house at this time, and Plaintiff went back inside the residence.

Deputies Ervin and Geiger asked whether there were weapons in the house and were informed by the other individuals on the scene that there were potentially two shotguns and a crossbow in the house. (Doc. 9-1, Ex. A at 20:31:20-34.) Shortly thereafter, someone at the scene requested that the deputies perform a well-being check on a minor child in the residence with Plaintiff. (Doc. 9-1, Ex. A at 20:32:15-25.) Lieutenant Parrott and Deputy Ervin knocked on the front door several times, announced that it was the Sheriff's Office, and requested that Plaintiff come to the door; Plaintiff failed to comply with opening the front door for over three minutes. (Doc. 9-1, Ex. A at 20:36:35-39:45.) Plaintiff eventually opened the front door, and Lieutenant Parrott gained entry to the house and checked on the minor child. (Doc. 9-1, Ex. A at 20:39:44-40:46.)

Lieutenant Parrott then told Plaintiff to find the keys to Mr. Halterman's truck so he could get his work clothes out of the truck. (Doc. 9-1, Ex. A at 20:40:47-52.) Plaintiff provided access to the truck and then proceeded to deny Mr. Halterman entry to the house because all of his clothes were purportedly in the truck. (Doc. 9-1, Ex. A at 20:50:22-32.) Defendants continued to inform Plaintiff that Mr. Halterman could enter the residence. (Doc. 9-1, Ex. A at 20:57:33-48 (Lieutenant Parrott telling Plaintiff, "I've already told him he could go in.").) After the exterior garage door to the residence was opened,[7] (*id.* at 20:59:33), Mr. Halterman picked up a crowbar and approached the interior garage door to gain entry to the residence. Plaintiff approached him and then stood in front of the interior garage door blocking his entry to the residence. (Doc. 9-1, Ex. A at 21:02:40-03:37.) Mr. Halterman moved away from the interior garage door. A few seconds later, Plaintiff also walked away from the interior garage door. (*Id.*) Lieutenant Parrott again informed Plaintiff that Mr. Halterman could enter the house. (Doc. 9-1, Ex. A at 21:03:57-04:12 ("He can go in his house" and "[h]e has access to his house.").)

---

[7] It is unclear from the body camera footage who opened the exterior garage door, and the parties provide no further evidence on this point in the summary judgment record. The Court notes that the exterior garage door appeared to open automatically, rather than by a person manually pulling up the garage door.

5

Mr. Halterman then returned to the interior garage door, picked up the crowbar, and again attempted to gain entry to the residence. Plaintiff approached the interior garage door where Mr. Halterman was standing with her hands in front of her. She made contact with Mr. Halterman who said "[d]on't touch me, she just . . . ." (Doc. 9-1, Ex. A at 21:04:25-28.) At that point, Deputy Ervin handcuffed Plaintiff and placed her under arrest. While being handcuffed, Plaintiff attempted to pull her arm away to answer her cell phone and had to be instructed to stop moving. (Doc. 9-1, Ex. A at 21:04:45-05:10.)

After being handcuffed, Plaintiff was escorted by Deputy Ervin out of the garage and up the driveway, with Deputy Geiger following shortly behind. (Doc. 39-1, Ex. A1 at 21:06:00-04.) As Plaintiff passed her Jeep, Deputy Geiger's body camera video shows Plaintiff attempt to grab her purse off the hood of the Jeep. (Doc. 39-1, Ex. A1 at 21:06:05-10.) Deputy Ervin directed Plaintiff to "stop walking away from me," and Plaintiff yelled for her neighbor to come help her. (Doc. 9-1, Ex. A at 21:05:19-25.) Plaintiff and Deputies Ervin and Geiger then continued to walk up the driveway toward the police vehicles. (Doc. 39-1, Ex. A1 at 21:06:25-34.)

As Plaintiff was being escorted in handcuffs to the police vehicles by Deputy Ervin, she held keys in her hands. As they approached the police vehicles, Deputy Geiger shined a flashlight on Plaintiff's hands. (Doc. 39-1, Ex. A1 at 21:06:35-40.) Plaintiff jerked away from Deputy Geiger as he reached for the keys in her hands and instructed her twice to "let go of the keys." (Doc. 39-1, Ex. A1 at 21:06:38-43; Doc. 9-1, Ex. A at 21:05:48-51.) Plaintiff did not let go of the keys but again yelled for her neighbor to help her. (Doc. 9-1, Ex. A at 21:05:52-54.) Then, Plaintiff fell to the ground and appears to have lost consciousness.[8] (Doc. 9-1, Ex. A at 21:05:55-6:05.) Plaintiff alleges that she was taken to the ground in a takedown maneuver where Deputies Ervin and Geiger "placed their feet above the Plaintiff's feet and on the Plaintiff's shins to trip the

---

[8] This fact remains controverted. Defendants argue that Plaintiff has not presented any evidence in the summary judgment record supporting her claim that she lost consciousness. However, the video evidence does not blatantly contradict Plaintiff's claim that she lost consciousness. After Plaintiff falls, the video shows that her eyes are closed and she is unresponsive to the deputies turning her over. Additionally, one of the deputies says, "I think she just knocked herself out," upon seeing Plaintiff on the ground. (Doc. 9-1, Ex. A at 21:05:55-6:05.) This is sufficient to raise an issue of material fact as to whether Plaintiff lost consciousness. Regardless, whether Plaintiff lost consciousness does not change the Court's decision herein.

6

Plaintiff," and "used their knees to push into the Plaintiff's calves." (Doc. 4 at ¶ 21.)[9]  When Plaintiff was able to be moved, the deputies assisted her to a standing position and placed her in a police vehicle.  (Doc. 9-1, Ex. A at 21:07:02-39.)

Further facts are set forth below as necessary.

**Legal Standard**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In this context, a fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In applying this standard, the Court must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Recio v. Creighton Univ.*, 521 F.3d 934, 938 (8th Cir. 2008).  "An 'adverse party may not rely merely on allegations or denials, but must set out specific facts—by affidavits or other evidence—showing [a] genuine issue for trial.'" *Nelson*, 513 F. Supp. 3d at 1104 (quoting *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008), and Fed. R. Civ. P. 56(e)).

"[I]f there is a video of the evidence in question that clearly contradicts the nonmovant's version of evidence, we view the facts 'in the light depicted by the videotape.'" *Leask v. City of Minneapolis*, 172 F.4th 598, 600 (8th Cir. 2026) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).  Moreover, the Court "do[es] not accept unreasonable inferences or sheer speculation of fact." *Mann v. Yarnell*, 497 F.3d 822, 827 (8th Cir. 2007).  Accordingly, the Eighth Circuit has

---

[9] This fact remains unsupported by evidence in the record as to either parties' version of events. The video does not blatantly contradict Plaintiff's allegations as to how she ended up on the ground (i.e., that the deputies engaged in a takedown or tripping maneuver).  Plaintiff's and Deputies Ervin's and Geiger's feet and legs are not clearly visible in the body camera footage at the time Plaintiff falls to the ground.  Thus, the proof of the means by which Plaintiff was taken to the ground would be conflicting testimony of Plaintiff and Defendants.  However, no deposition testimony was submitted in the summary judgment record.  The Court resolves the summary judgment motion drawing this fact in Plaintiff's favor, i.e., that a takedown occurred.  The Court's decision herein would be the same if the deputies did not purposefully trip Plaintiff or use a takedown maneuver.

*rejected* the argument that "to the extent that [a] video is unclear, this ambiguity creates a genuine issue of material fact that must be interpreted" in the nonmoving party's favor. *Id.*

**Discussion**

Plaintiff's sole remaining claim is Count 1, a § 1983 claim asserting a Fourth Amendment violation for excessive force based on Plaintiff being taken to the ground while in handcuffs. Defendants argue that they are entitled to qualified immunity on Plaintiff's remaining excessive force claim.

"Every section 1983 action has two key elements: (1) the violation of a right secured by the Constitution and laws of the United States (2) by a person acting under color of state law." *Yassin v. Weyker*, 39 F.4th 1086, 1089 (8th Cir. 2022) (internal quotation marks omitted). Here, it is uncontroverted that Defendants were acting under color of state law during the interaction with Plaintiff on April 29, 2023. Thus, the remainder of the Court's analysis focuses on whether there was a violation of constitutional right and whether Defendants are entitled to qualified immunity.

Section § 1983 claims asserting use of excessive force are analyzed "under the Fourth Amendment and its 'reasonableness standard,' assessing whether [Defendants'] actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Cameron v. City of Des Moines*, 168 F.4th 522, 527 (8th Cir. 2026) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Courts consider the totality of the circumstances, which includes 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest.'" *Rogers v. King*, 885 F.3d 1118, 1121 (8th Cir. 2018) (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)).

Defendants have invoked qualified immunity. "[Q]ualified immunity is a "two-step inquiry, asking if: '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" *Just v. City of St. Louis*, 7 F.4th 761, 766 (8th Cir. 2021) (quoting *Bell v. Neukirch*, 979 F.3d 594, 602 (8th Cir. 2020)). A failure of proof at either step is dispositive. *See Howard v. Kan. City Police Dep't*, 570 F.3d 984, 987-88 (8th Cir. 2009); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (recognizing the court's discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court

8

has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

## I.     Plaintiff Has Not Met Her Burden to Contest Qualified Immunity

Plaintiff does not address Defendants' qualified immunity argument in her suggestions in opposition to summary judgment. (*See generally* Doc. 52.) Thus, Defendants argue that they are entitled to qualified immunity because Plaintiff did not meet her burden of proof and did not cite any cases which would support her position or any that are contrary to Defendants' cases and positions as to qualified immunity.

As to the clearly established prong of the qualified immunity test, "the plaintiff has the burden of demonstrating that the law confirming [her] constitutional right was clearly established" at the time of the deprivation. *Carter v. Ludwick*, 139 F.4th 982, 990 (8th Cir. 2025) (quoting *Hanson v. Best*, 915 F.3d 543, 548 (8th Cir. 2019)). "This inquiry does not require 'a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Eighth Circuit has further explained that this requires the plaintiff to

> either (1) "point to existing circuit precedent that involves sufficiently similar facts to squarely govern the officer's actions such that the officer had notice that his specific use of force was unlawful"; (2) "present a robust consensus of cases of persuasive authority doing the same"; or (3) "demonstrate that a general constitutional rule applied with obvious clarity to the facts at issue."

*Cameron*, 168 F.4th at 527-28 (quoting *Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020)).

Plaintiff failed to carry her burden to demonstrate that Defendants violated a clearly established constitutional right because she did not make any arguments regarding qualified immunity and she did not cite any caselaw that demonstrates that Defendants violated a clearly established constitutional right (either through existing circuit precedent, a consensus of persuasive authority, or a general constitutional rule).[10] *See Smith v. City of Minneapolis*, 754 F.3d 541, 548 (8th Cir. 2014) ("Ms. Smith *has not cited any case*, much less any case that could cast the 'constitutional question beyond debate,' such that any of the five officers would be on notice that his actions . . . violated Smith's constitutional right . . . ." (internal citation omitted)) (granting

___

[10] More generally, Plaintiff fails to cite a single legal authority throughout her suggestions in opposition to summary judgment. (Doc. 52.)

9

qualified immunity).  Thus, Defendants are entitled to qualified immunity on Plaintiff's remaining § 1983 excessive force claim, and Defendants' motion for summary judgment is **GRANTED**.

**II.    Deputy Ervin and Deputy Geiger – Direct Force Taking Plaintiff to the Ground**

Even if the Court overlooked Plaintiff's failure to present any argument challenging qualified immunity or caselaw showing a clearly established constitutional right, the Court also finds that Deputy Ervin and Deputy Geiger are entitled to qualified immunity on the merits because they did not violate a clearly established constitutional right under the circumstances.

Plaintiff claims that Deputy Ervin and Deputy Geiger used excessive force by taking Plaintiff to the ground while handcuffed.[11]  As previously discussed, the Court analyzes this claim "under the Fourth Amendment and its 'reasonableness' standard," including "the severity of the crime at issue, whether [Plaintiff] pose[d] an immediate threat to the safety of the officers or others, and whether [s]he [was] actively resisting arrest or attempting to evade arrest by flight." *Cameron*, 168 F.4th at 527, 529 (quoting *Graham*, 490 U.S. at 395-96) (quotation modified).  Reasonableness is "judged from the perspective of a reasonable officer on the scene at the time the force was applied." *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011).  Because the Defendants have invoked qualified immunity, Plaintiff "must show not only that [they] violated a constitutional right, but that the right was 'clearly established' at the time of the violation." *Cameron*, 168 F.4th at 527 (citing *Pearson*, 555 U.S. at 232).

At the motion-to-dismiss stage, the Court accepted as true all of Plaintiff's well-pleaded allegations and addressed Defendants' qualified immunity argument assuming that Plaintiff "was handcuffed and not resisting the deputies" at the time she was taken to the ground.  (Doc. 49 at 18.)  In other words, the Court proceeded assuming Plaintiff was compliant at the time, as indicated by her pleadings and arguments.[12]  As a result, the Court followed a line of cases which indicate

---

[11] Plaintiff also alleged the use of excessive force by tight handcuffing and pushing Plaintiff into the handle of her Jeep.  The Court previously granted Defendants' motion to dismiss as to these alleged uses of force.  (Doc. 49 at 15-18.)

[12] In so doing, the Court noted that the video evidence did not blatantly contradict Plaintiff's theory of events regarding whether she was taken to the ground purposefully.  However, the video evidence does show that Plaintiff did not let go of the keys in the seconds between being directed to do so and Plaintiff ending up on the ground.  Plaintiff has not presented any further evidence on this matter, such as any attempts to comply when directed to let go of the keys.  Thus, at the summary judgment phase, Plaintiff has not presented any credible evidence of compliance at the time she was taken to the ground.

that when a person is subdued and restrained in handcuffs a "gratuitous and completely unnecessary act of violence" is unreasonable. (*Id.* at 19 (quoting *Blazek v. City of Iowa City*, 761 F.3d 920, 925 (8th Cir. 2014).) *See also Burnikel v. Fong*, 886 F.3d 706, 712 (8th Cir. 2018) ("Accordingly, a reasonable officer would have understood that purposefully dropping Burnikel face-first onto the concrete after he had been subdued and handcuffed would violate clearly established law."). *Blazek*, and other cases like it, however, in large part turn on the fact that the use of force occurred while the individual was already restrained *and was being compliant*. *Blazek*, 760 F.2d at 925; *Burnikel*, 886 F.3d at 712; *see also Henderson*, 439 F.3d at 503.

At the summary-judgment stage, the Court cannot accept as true Plaintiff's pleadings and arguments which have not been supported by citation to evidence in the record. Defendants carried their burden to support the motion for summary judgment. Defendants' statement of uncontroverted facts sets forth that Plaintiff held keys in her hands as she was being escorted to the police vehicle. "[A] reasonable officer could have construed keys as a weapon, especially when dealing with a person accused of violent behavior." *Robles v. Ciarletta*, 797 F. App'x 821, 827 (5th Cir. 2019). Then, when Deputy Geiger reached for the keys in Plaintiff's hands, she jerked away from him rather than letting go of the keys.[13] These facts, deemed admitted above, establish that Plaintiff was not compliant with the deputies at the time she was taken to the ground. A non-compliant individual holding keys, which are reasonably construed as a weapon by law enforcement, could lead a reasonable officer to believe Plaintiff was dangerous to others under the circumstances. *Graham*, 490 U.S. at 396 (considering whether individual poses a threat to officers or others in determining reasonableness)

Upon further review of the video evidence, it also supports the deputies' version of events (i.e., that Plaintiff was not compliant at the time she was taken to the ground).[14] Deputy Geiger

---

[13] The Court accepts as true Defendants' statement of uncontroverted facts that Plaintiff jerked away from Deputy Geiger. However, the Court notes that Plaintiff, without proper evidentiary support, argues that she did not jerk away from Deputy Geiger. Plaintiff does admit that the interaction created the "illusion" that she jerked away from him. *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020) ("An officer is entitled to the use of force where a suspect at least appears to be resisting." (internal quotation marks omitted)). Thus, even considering Plaintiff's unsupported version of events, the takedown would be reasonable given the appearance of resistance.

[14] Even if the video did not corroborate the deputies' version of events, at best for Plaintiff it is ambiguous or unclear as to Plaintiff's compliance. Where a defendant has presented evidence in support of summary judgment, the Eighth Circuit has rejected the argument that "to the extent that the video is

11

directed Plaintiff to let go of the keys in her hand twice, and she did not let go. When Deputy Geiger reached out to take the keys from Plaintiff, she appears to jerk away from him. (Doc. 39-1, Ex. A1 at 21:06:38-43; Doc. 9-1, Ex. A at 21:05:48-51.) Moreover, Plaintiff begins calling for her neighbor to come and help her. (Doc. 9-1, Ex. A at 21:05:52-54.) Admittedly, and as recognized in the motion-to-dismiss Order, the time between Deputy Geiger telling Plaintiff to let go of the keys and Plaintiff being taken to the ground is short (less than 10 seconds).

However, Plaintiff in contesting summary judgment has presented no credible evidence that she was being compliant at the time she was taken to the ground. *See Crossley v. Georgia-Pac. Corp.*, 355 F.3d 1112, 1113 (8th Cir. 2004) ("In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy." (internal quotation marks omitted)). While Plaintiff (without citation to evidence) alleges that she "tried to give the officers her keys in the garage," she makes no attempt to controvert the fact that she was still holding the keys while being escorted to the police vehicle. (Doc. 52 at 6.) Nor does she argue that she let go of the keys when directed to do so twice.[15] She also does not contest that the ensuing interaction when Deputy Geiger reached for the keys at least created an "illusion" that she was pulling away from the deputies, *see Kohorst*, 968 F.3d at 876, and she does not contest that instead of letting go of the keys she began to yell for her neighbor to help her.

In addition to Plaintiff's non-compliance, consideration of other circumstances surrounding the use of force is warranted. Defendants were called to the scene by Plaintiff and

---

unclear, this ambiguity creates a genuine issue of material fact" to be resolved in a plaintiff's favor. *Mann*, 497 F.3d at 827. In *Mann*, the court affirmed summary judgment where defendants presented evidence of their version of events and Plaintiff relied on a "dark and often unintelligible video" paired with a "speculative and wishful recitation of events" that was not supported by any evidence in the record. Applying *Mann* to this case, Defendants have properly supported the motion for summary judgment and established Plaintiff was holding keys and jerked away from Deputy Geiger when he tried to take them. Thus, Plaintiff cannot rely solely on an ambiguous or unclear video to create a genuine issue of material fact. Regardless, the Court finds that the video is not unclear as to this point—it shows that Plaintiff did not let go of the keys as requested and began yelling for help rather than complying.

[15] Plaintiff did not present any evidence in opposition to Defendants' motion for summary judgment. Though she vaguely references evidence previously filed in the case, presumably related to prior filings or motions, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Crossley*, 355 F.3d at 1114.

engaged in a tense hour-and-a-half interaction with Plaintiff, Mr. Halterman, and three other individuals. During that time, Plaintiff repeatedly disregarded directives from law enforcement. For example, Plaintiff refused to permit Mr. Halterman to enter the residence, despite hearing Defendants give him permission to do so multiple times. (*See, e.g.*, Doc. 9-1, Ex. A at 20:12:45-15:20.) While being handcuffed, Plaintiff attempted to pull her arm away to answer her cell phone and had to be instructed to stop moving. (Doc. 9-1, Ex. A at 21:04:45-05:10.) And as Plaintiff was escorted in handcuffs past her Jeep, Deputy Geiger's body camera video shows Plaintiff attempted to grab her purse off the hood of the Jeep. (Doc. 39-1, Ex. A1 at 21:06:05-10.) This led to Deputy Ervin directing Plaintiff to "stop walking away from me," and Plaintiff yelling for her neighbor to come help her for the first time. (Doc. 9-1, Ex. A at 21:05:19-25.)

Defendants also heard Mr. Halterman repeatedly advise that Plaintiff was physical and violent. (Doc. 9-1, Ex. A at 19:57:05-12, 20:05:21-40, 20:07:15-20, 20:51:10-15.) Deputies Ervin and Geiger asked whether there were weapons in the house and were informed that there were potentially two shotguns and a crossbow in the house. (Doc. 9-1, Ex. A at 20:31:20-34.) Defendants were also asked to conduct a well-being check on a minor child in the residence with Plaintiff. (Doc. 9-1, Ex. A at 20:32:15-25.) When Defendants attempted to conduct the well-being check, Plaintiff failed to comply with opening the front door for over three minutes. (Doc. 9-1, Ex. A at 20:36:35-39:45.)

Additionally, Defendants observed Plaintiff reaching out and touching Bobby Lee Halterman immediately preceding her arrest. Plaintiff quickly approached the interior garage door where Mr. Halterman was standing with her hands in front of her. She made contact with Mr. Halterman who said "[d]on't touch me, she just . . . ." (Doc. 9-1, Ex. A at 21:04:25-28.) At that point, Deputy Ervin handcuffed Plaintiff and placed her under arrest. As found in the Court's motion-to-dismiss Order, the video evidence establishes probable cause that Plaintiff knowingly caused physical contact with Mr. Halterman knowing he would find that contact offensive. *See* Mo. Rev. Stat. §§ 565.076.1(5) (domestic assault in the fourth degree), 565.056.1(6) (assault in the fourth degree).[16] As previously discussed, the severity of the crime at issue is a consideration for determining reasonableness. *Graham*, 490 U.S. at 396

---

[16] (*See also* Doc. 39 at 6, ¶ 4 ("[I]mmediately before she was arrested, Shavonne Halterman physically contacted Bobby Lee Halterman."); *id.* at ¶ 5 ("Shavonne Halterman knew Bobby Lee Halterman

Ultimately, Plaintiff's non-compliance—in combination with the other circumstances known to Defendants at the time of the use of force—remove this case from the realm of clearly established caselaw concluding that gratuitous force against a *compliant* handcuffed individual is excessive. Caselaw indicates that the use of takedown force is reasonable where a handcuffed individual is *non-compliant* with law enforcement. *See Womack v. Bradshaw*, 49 F. Supp. 3d 624, 634 (W.D. Mo. 2014) ("Here, the proper inquiry is whether federal decisional law as of [the date of the use of force], clearly established that it was unconstitutional for an arresting officer to use a takedown maneuver against an arrestee who was resisting despite being placed in handcuffs. The Court finds that it was not."); *id.* at 635 ("Plaintiff fails to direct the court to any authority suggesting it was unreasonable to use a takedown maneuver against a handcuffed *yet resisting arrestee*."); *see also Aikens v. Metz*, No. 24-569 (DWF/DTS), 2026 WL 1256973, at *6 (D. Minn. May 7, 2026) (finding officer entitled to qualified immunity for taking handcuffed arrestee to the ground where Aikens did not "show that he was compliant or subdued so as to fall squarely into the facts of *Blazek*."), *appeal filed* No. 26-2106 (8th Cir.).

The Court need not definitively conclude whether Deputy Ervin's and Deputy Geiger's actions violated Plaintiff's Fourth Amendment right to be free from excessive force; it is enough that under the circumstances—where a handcuffed individual is non-compliant, holding keys, appears to jerk away, and yells for help—there is no clearly established constitutional right to be free from being taken to the ground. *See Womack*, 49 F. Supp. 3d at 634-35. Thus, Deputy Ervin and Deputy Geiger are entitled to qualified immunity on Plaintiff's remaining Fourth Amendment excessive force claim.

### III. Lieutenant Parrott – Failure to Intervene

Plaintiff asserts an excessive force claim against Lieutenant Parrott on a failure-to-intervene theory. "Officers who do not directly use excessive force, but fail to intervene to prevent the use of excessive force by another officer, may be liable for violating the Fourth Amendment." *Ortega v. City of St. Louis*, No. 4:18-cv-1576-DDN, 2021 WL 3286703, at *14 (E.D. Mo. Aug. 2, 2021) (citing *Nance v. Sammis*, 586 F.3d 604, 611-12 (8th Cir. 2009)). However, an officer can only be liable for failure to intervene "where the officer (1) 'observed or had reason to know that

---

did not wish to be physically contacted by Shavonne Halterman to the extent such contact would have knowingly been offensive or provocative.").)

excessive force would be or was being used,' and (2) 'had both the opportunity and the means to prevent the harm from occurring.'" *Cameron*, 168 F.4th at 531 (8th Cir. 2026) (quoting *Nance*, 586 F.3d at 612).

Summary judgment is warranted on the claim against Lieutenant Parrott (1) because he was not physically in a position to intervene and (2) because he is entitled to qualified immunity if the officers who used force are entitled to qualified immunity.[17] Here, the video evidence in the record shows that Lieutenant Parrott was at the bottom of the driveway by the garage when Plaintiff was taken to the ground, and that he did not have the opportunity to prevent the use of force. (Doc 33-3, Ex. PP at 21:06:36-21:08:26.)[18] Plaintiff has not asserted any additional material facts, nor provided any other evidence which would suggest that Lieutenant Parrott had the opportunity or the means to prevent the harm from occurring. The time between Deputy Geiger attempting to take the keys out of Plaintiff's hand and the use of force which took her to the ground was insufficient for Lieutenant Parrott to intervene to stop the use of force. Accordingly, Lieutenant Parrott is entitled to judgment as a matter of law on Plaintiff's § 1983 excessive force claim premised on failure to intervene.

Additionally, the Court further finds that Lieutenant Parrot is entitled to qualified immunity as to Plaintiff's excessive force claim. "[W]here an officer's alleged excessive force did not violate a clearly established right, qualified immunity shields other officers against a claim that they failed to intervene to prevent that use of force." *Cameron*, 168 F.4th at 530; *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015) (holding that qualified immunity applied to officer against whom a failure-to-intervene claim was alleged where officer against whom the accompanying excessive-force claim was alleged was entitled to qualified immunity). Here, the Court has concluded that Deputy Ervin and Deputy Geiger are entitled to qualified immunity on

---

[17] It makes no difference to the outcome if Lieutenant Parrott was working in a supervisory role. The analysis would be the same on this failure-to-intervene claim. *See Loggins v. Albert*, No. 24-1545, 2024 WL 5074756, at *1 (8th Cir. Dec. 11, 2024) (per curiam) (holding that supervisory officers were entitled to qualified immunity on the claims related to their failure to intervene in the alleged excessive force where officers were entitled to qualified immunity on excessive force claim).

[18] The video referenced here shows that Lieutenant Parrott was at the bottom of the driveway speaking with the other individuals at the time Plaintiff was taken to the ground at the top of the driveway near the police vehicles. He did not approach the police vehicles until Plaintiff had been returned to her feet from her position on the ground and was being placed in the police vehicle.

15

the remaining excessive force claim for their use of direct force; therefore, Lieutenant Parrott is entitled to qualified immunity as to Plaintiff's failure-to-intervene claim based on that same use of force.

**Conclusion**

Accordingly, after careful consideration and for the reasons explained above, the Court **ORDERS** that Defendants' motion for summary judgment, (Doc. 37), is **GRANTED**.

**IT IS SO ORDERED.**


s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT


DATED:  July 29, 2026

16